# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No.: 14-211 (EGS)** |
| **v.** | : | |
| | : | |
| **INTELLIGENT DECISIONS, INC.** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### DEFERRED PROSECUTION AGREEMENT

Defendant Intelligent Decisions, Inc. (the "Company"), by its undersigned representatives, pursuant to authority granted by the Company's Board of Directors, and the Criminal Division of the Office of the United States Attorney for the District of Columbia (the "Office") enter into this deferred prosecution agreement (the "Agreement"). The terms and conditions of this Agreement are as follows:

### Criminal Information and Acceptance of Responsibility

1.     The Company acknowledges and agrees that the Office will file the attached one-count criminal Information in the United States District Court for the District of Columbia charging the Company with felony Gratuity, in violation of 18 U.S.C. § 201(c)(1)(A).  In so doing, the Company: (a) knowingly waives its right to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives for purposes of this Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts any objection with respect to venue and consents to

1

the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of Columbia.

2.      The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts attached hereto as Attachment A and incorporated by reference into this Agreement, and that the allegations described in the Information and the facts described in Attachment A are true and accurate.  Should the Office pursue the prosecution that is deferred by this Agreement, the Company stipulates to the admissibility of the Statement of Facts in any proceeding, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding.

### Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending two (2) years from that date (the "Term").  The Company agrees, however, that, in the event the Office determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement, an extension or extensions of the term of the Agreement may be imposed by the Office, in its sole discretion, for up to a total additional time period of one year, without prejudice to the Office's right to proceed as provided in Paragraphs 13 through 15 below.  Any extension of the Agreement extends all terms of this Agreement for an equivalent period.  Conversely, in the event the Office finds, in its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for an extension and that the other provisions of this Agreement have been satisfied, the Term of the Agreement may be terminated early.

2

### Relevant Considerations

4.      The Office enters into this Agreement based on the individual facts and circumstances presented by this case and the Company.  Among the factors considered were the following: (a) the Company has cooperated, including conducting an internal investigation, voluntarily making employees available for interviews, and collecting, analyzing, and organizing evidence and information for the Office; (b) the Company has committed to enhance its compliance program and internal controls; and (c) the Company has agreed to continue to cooperate with the Office in any ongoing investigation of the conduct of the Company and its officers, directors, employees, agents, and consultants relating to possible violations under investigation by the Office as provided in Paragraph 5 below.

### Future Cooperation and Disclosure Requirements

5.      The Company shall cooperate fully with the Office in any and all matters relating to the conduct described in this Agreement and Attachment A and other conduct under investigation by the Office at any time during the Term of this Agreement, subject to applicable law and regulations, until the date upon which all investigations and prosecutions arising out of such conduct are concluded, whether or not those investigations and prosecutions are concluded within the term specified in paragraph 3.  At the request of the Office, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and Attachment A and other conduct under investigation by the Office at any time during the Term of this Agreement.  The Company agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

3

a.     The Company shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, those of its parent company and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Office may inquire.  This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Office, upon request, any document, record or other tangible evidence about which the Office may inquire of the Company.

b.     Upon request of the Office, the Company shall designate knowledgeable employees, agents, or attorneys to provide to the Office the information and materials described in Paragraph 5(a) above on behalf of the Company.  It is further understood that the Company must at all times provide complete, truthful, and accurate information.

c.     The Company shall use its best efforts to make available for interviews or testimony, as requested by the Office, present or former officers, directors, employees, agents, and consultants of the Company.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities.  Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

d.     With respect to any information, testimony, documents, records, or other tangible evidence provided to the Office pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable law and regulations, to other governmental

4

authorities, including United States authorities and those of a foreign government, of such materials as the Office, in its sole discretion, shall deem appropriate.

6.      In addition to the obligations in Paragraph 5, during the Term of the Agreement, should the Company learn of credible evidence or allegations of possible corrupt payments to public officials or other government contractors, the Company shall promptly report such evidence or allegations to the Office.

### Payment of Monetary Penalty

7.      The Office and the Company agree that application of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine range yields the following analysis:

a.      The 2013 USSG are applicable to this matter.

b.      Offense Level. Based upon USSG § 2C1.2, the total offense level is 17, calculated as follows:

|  |  |  |
|---|---|---|
| (a)(2) | Base Offense Level | 9 |
| (b)(1) | More than One Gratuity | +2 |
| (b)(2) | Value of benefit received more than $30,000 | +6 |
| **TOTAL** |  | 17 |

c.      Base Fine. Based upon USSG § 8C2.4(a)(1), the base fine is $250,000 (the fine indicated in the Offense Level Fine Table)

d.      Culpability Score. Based upon USSG § 8C2.5, the culpability score is 6, calculated as follows:

|  |  |  |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(3) | the organization had 200 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +3 |

5

(g)(2)  The organization fully cooperated in the investigation, and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct                - 2

**TOTAL**                                                              6

Calculation of Fine Range:

| | |
|---|---|
| Base Fine | $250,000 |
| Multipliers | 1.2 (min) / 2.4 (max) |
| Fine Range | $300,000 / $600,000 |

The Company agrees to pay a monetary penalty in the amount of $300,000 to the United States Treasury within ten (10) days of the filing of the Information.  The Company and the Office agree that this fine is appropriate given the facts and circumstances of this case.  The $300,000 penalty is final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Office that $300,000 is the maximum penalty that may be imposed in any future prosecution, and the Office is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Office agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment.  The Company acknowledges that no United States tax deduction may be sought in connection with the payment of any part of this $300,000 penalty.

**Conditional Release from Liability**

8.     Subject to Paragraphs 13 through 15, the Office agrees, except as provided herein, that it will not bring any criminal or civil case against the Company relating to any of the

conduct described in the Statement of Facts, attached hereto as Attachment A, or the criminal information filed pursuant to this Agreement. The Office, however, may use any information related to the conduct described in the attached Statement of Facts against the Company: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

a.      This Agreement does not provide any protection against prosecution for any future conduct by the Company.

b.      In addition, this Agreement does not provide any protection against prosecution of any present or former officer, director, employee, shareholder, agent, consultant, contractor, or subcontractor of the Company for any violations committed by them.

### Corporate Compliance Program

9.      The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of 18 U.S.C. § 201 and other applicable anti-corruption laws throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with public officials or other activities carrying a high risk of corruption.

10.     In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal accounting controls, policies, and procedures regarding compliance with anti-

7

corruption laws. If necessary and appropriate, the Company will adopt new or modify existing internal controls, policies, and procedures in order to ensure that the Company maintains: (a) a system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) rigorous anti-corruption compliance code, standards, and procedures designed to detect and deter violations of anti-corruption laws.

### Deferred Prosecution

11.    In consideration of: (a) the past and future cooperation of the Company described in Paragraphs 5 and 6 above; (b) the Company's payment of a criminal penalty of $300,000; and (c) the Company's implementation and maintenance of remedial measures as described in Paragraphs 9 and 10 above, the Office agrees that any prosecution of the Company for the conduct set forth in the attached Statement of Facts, and for the conduct that the Company disclosed to the Office prior to the signing of this Agreement, be and hereby is deferred for the Term of this Agreement.

12.    The Office further agrees that if the Company fully complies with all of its obligations under this Agreement, the Office will not continue the criminal prosecution against the Company described in Paragraphs 1 and 2 and, at the conclusion of the Term, this Agreement shall expire. Within thirty (30) days of the Agreement's expiration, the Office shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agrees not to file charges in the future against the Company based on the conduct described in this Agreement and Attachment A.

### Breach of the Agreement

13.    If, during the Term of this Agreement, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false,

8

incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to maintain a compliance program as set forth in Paragraphs 9 and 10 of this Agreement; or (e) otherwise fails specifically to perform or to fulfill completely each of the Company's obligations under the Agreement, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Office has knowledge, including, but not limited to, the charge in the Information described in Paragraph 1, which may be pursued by the Office in the U.S. District Court for the District of Columbia or any other appropriate venue. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Office's sole discretion. Any such prosecution may be premised on information provided by the Company. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.

14.     In the event the Office determines that the Company has breached this Agreement, the Office agrees to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty (30) days of receipt of such notice, the Company shall have the opportunity to respond to the Office in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to

address and remediate the situation, which explanation the Office shall consider in determining whether to pursue prosecution of the Company.

15.     In the event that the Office determines that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the Office or to the Court, including the attached Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Office against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer, or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Office.

16.     The Company acknowledges that the Office has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.   The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

17.     No later than 90 days prior to the expiration of the period of deferred prosecution specified in this Agreement, the Company, by the Chief Executive Officer of the Company and

10

the Chief Financial Officer of the Company, will certify to the Department that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement. Such certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

## Sale or Merger of Company

18.     Except as may otherwise be agreed by the parties hereto in connection with a particular transaction, the Company agrees that in the event it sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, or transfer, it shall include in any contract for sale, merger, or transfer a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.

## Public Statements by Company

19.     The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 1 and 2 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Office. If the Office determines that a public

11

statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Office shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five (5) business days after notification. The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

20.    The Company agrees that if it, or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Office and the Company; and (b) whether the Office has any objection to the release.

21.    The Office agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation. By agreeing to provide this information to such authorities, the Office is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

## Limitations on Binding Effect of Agreement

12

22.     This Agreement is binding on the Company and the Office but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Office will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

## Notice

23.     Any notice to the Office under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed Chief – Fraud and Public Corruption Section, Criminal Division, U.S. Attorney's Office for the District of Columbia, 555 Fourth Street, N.W., Washington, D.C. 20530.  Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Intelligent Decisions, Inc., 21445 Beaumeade Circle, Ashburn, VA, Attn:  President.   Notice shall be effective upon actual receipt by the Office or the Company.

## Complete Agreement

24.     This Agreement sets forth all the terms of the agreement between the Company and the Office.  No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, the attorneys for the Company and a duly authorized representative of the Company.

13

**AGREED:**

**FOR INTELLIGENT DECISIONS, INC.:**

Date: __October 6, 2014__          By: _____

Harry I. Martin, Jr.
President & Chief Executive Officer

Date: __10:6/14__          By: _____

Paul F. Enzinna
Brown Rudnick LLP

**FOR THE OFFICE OF THE UNITED STATES ATTORNEY**
**FOR THE DISTRICT OF COLUMBIA:**

RONALD C. MACHEN JR.
United States Attorney

Date: __10/6/2014__          BY: _____

Bryan Seeley
Michael K. Atkinson
Assistant United States Attorneys
United States Attorney's Office for the
District of Columbia

14

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Intelligent Decisions, Inc. (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the President and Chief Executive Officer for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: _____

Intelligent Decisions, Inc.

By: _____
Harry I. Martin, Jr.
President & Chief Executive Officer

## CERTIFICATE OF COUNSEL

I am counsel for Intelligent Decisions, Inc. (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the President and Chief Executive Officer of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: _3 OCTOBER 2014_

By: _____

Paul F. Enzinna
Brown Rudnick LLP
Counsel for Intelligent Decisions, Inc.

ATTACHMENT A

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the Criminal Division of the Office of the United States Attorney for the District of Columbia (the "Office") and Intelligent Decisions, Inc. ("Intelligent Decisions").  Intelligent Decisions hereby agrees and stipulates that the following information is true and accurate.  Intelligent Decisions admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below.  Should the Office pursue the prosecution that is deferred by this Agreement, Intelligent Decisions agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding.  The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

### Relevant Entities and Individuals

1.      Intelligent Decisions was an information technology company with offices in Ashburn, Virginia.  The vast majority of the business of Intelligent Decisions came from contracts with the United States government

2.      Harry I. Martin, Jr. ("Martin"), was the founder, President, Chief Executive Officer, and 100-percent owner of Intelligent Decisions.  Martin possessed a corporate credit card to use for business purposes.

3.      Until 2011, Chae Shim ("Shim") was the Director of Acquisition Accounts, Asia/Pacific, for Intelligent Decisions.  Intelligent Decisions provided Shim with a corporate credit card to use for business purposes.

4.      The Program Executive Office Enterprise Information Systems ("PEO EIS") was an organization within the United States Department of the Army ("Army"), which provided infrastructure and information management systems to the Army.  The Project Manager, Defense Communications and Army Transmission Systems ("PM DCATS"), was a division of PEO EIS. The Product Management, Installation Information Infrastructure Modernization Program ("PM I3MP"), was another division of PEO EIS.

5.      In Seon Lim ("Lim") was a public official until on or about April 27, 2012.  Lim was an Assistant Project Manager for PM DCATS until in or about June 2010.  While employed as an Assistant Project Manager, Lim resided and worked in Seoul, South Korea.  From in or about June 2010 until his resignation on or about April 27, 2012, Lim was a Product Director for PM I3MP.

6.      While stationed in Seoul, South Korea, Lim coordinated a task on a prime contract with the Eighth United States Army, Command and Control C4IT Technical Support Services, prime contract number W15P7T-06-D-E407 (the "Prime Contract").  Lim was the most senior PM DCATS employee stationed in South Korea.  Lim's primary official duties in South Korea were to oversee and implement communication systems upgrades for the U.S. Forces in South Korea, which included approximately ten communication centers and various other special projects at military sites throughout the country, including equipping video conference centers. As part of those official duties, Lim talked with "customers" (commanders at various military sites), determined their needs, wrote contract requirements and the statements of work, and worked with the contracting center in Fort Monmouth, New Jersey, to bid contracts based on customer requirements.

7.      Company F was the prime contractor for the Prime Contract.   Company F maintained offices in Eatontown, New Jersey.

8.      Unisource Enterprise Inc. ("UEI"), was a government contractor that maintained its corporate headquarters in Annandale, Virginia.   Nick Park, a/k/a Nochol Park ("Park"), founded UEI in 2007.  From in or about September 2008 through in or about January 2009, UEI obtained an Information Technology Help Desk subcontract under the Prime Contract.  In or about January 2009, Intelligent Decisions replaced UEI as a subcontractor under the Prime Contract.  Intelligent Decisions remained a subcontractor on the Prime Contract until in or about March 2010.

9.      Oh Sung Kwon, a/k/a Thomas Kwon ("Kwon"), was the co-founder and Chief Financial Officer of Avenciatech, Inc. ("Avenciatech"), which maintained its corporate headquarters in Annandale, Virginia.   Since in or about October 2009, Avenciatech was a subcontractor under the Prime Contract.

10.      John Han Lee ("Lee") was a former employee of UEI and, later, Intelligent Decisions.  In or about December 2009, Lee left Intelligent Decisions and became the Vice President-Operations of Avenciatech.

11.      King Everett Johnson ("Johnson") was an employee of Intelligent Decisions from in or about January 2009 through in or about October 2009, stationed in Seoul, South Korea.

12.      Jin Seok Kim ("Kim") was the founder and managing director of Saena Tech Corporation ("Saena Tech"), which maintained its corporate headquarters in Seoul, South Korea. Saena Tech operated as a subcontractor for Intelligent Decisions and other U.S.-based government contracting companies providing technical services and equipment for the Eighth United States Army.

## The Scheme

13.     In or about January 2009, Lee approached Martin and Shim with the opportunity for Intelligent Decisions to take over two subcontracts from UEI pertaining to an information technology help desk.  Martin and Shim expressed interest in having Intelligent Decisions take over the subcontracts.

14.     Prior to the award of the subcontracts, Martin and Shim traveled to South Korea to meet with Lim.  On or about January 23, 2009, in South Korea, Martin used his corporate credit card to pay approximately $553.03 for dinner for six individuals, including Lim and Shim. On or about January 24, 2009, in South Korea, Shim used his corporate credit card to pay approximately $2,382.49 for drinks and entertainment for six individuals, including Lim and Martin.

15.     On or about January 26, 2009, Martin and Shim sent emails to Lim as a follow-up to their meeting with Lim in South Korea.  Both Martin and Shim expressed their desire for Intelligent Decisions to work together with Lim.

16.     On or about January 30, 2009, with Lim's assistance, Intelligent Decisions was awarded the Help Desk subcontracts previously held by UEI.  The first subcontract (Purchase Order Number S352009-1) had an initial period of performance from February 1, 2009 through March 31, 2009, with an initial value of $525,000.  The second subcontract (Purchase Order Number S352009-2) had an initial period of performance from February 1, 2009 through March 28, 2009, with an initial value of $67,294.40.   As part of the agreement to obtain the subcontracts, Intelligent Decisions hired Lee, Johnson, and another former UEI employee to work for Intelligent Decisions on the subcontracts in South Korea.

17.     After obtaining the subcontracts, Intelligent Decisions paid for rail transportation, hotel, and meal expenses for Lim and Lim's close family members to travel for a weekend stay in Busan, South Korea in February 2009.  Martin and Shim were present in Busan and approved the expenses.  Rail transportation cost approximately $370 and the hotel cost approximately $462.66.  On or about February 21, 2009, Martin used his corporate credit card to pay approximately $2,353.68 for drinks and entertainment for six individuals, including Lim and Shim.  That same day in Busan, another employee of Intelligent Decisions spent approximately $332 on drinks and entertainment for himself and Lim.

18.     In or around February 2009, Lee, on behalf of Intelligent Decisions, spent approximately $1032.32 on food, drinks, and entertainment in South Korea for Lee, Lim, and another Army official, over the course of several days.

19.     In or around February 2009, Lee agreed, on behalf of Intelligent Decisions, to pay for a Lexus ES350 that Lim had ordered in January 2009.  The purchase price of the vehicle was approximately $30,723.52.  While Lee sought money from Martin and Shim to pay for the vehicle, Lee directed Kim to pay the Lexus dealership.  After Kim paid the dealership, Lee and another Intelligent Decisions employee continued to seek reimbursement from Martin and Shim.  Intelligent Decisions ultimately did not reimburse Kim, directly or indirectly, for the vehicle purchase.

20.     On or about March 2, 2009, Johnson, on behalf of Intelligent Decisions, paid approximately $54.79 for a lunch for himself and Lim in South Korea.

21.     On or about March 27, 2009, with Lim's assistance, Intelligent Decisions obtained a modification of Purchase Order Number S352009-1 to extend the period of performance through February 26, 2010, and to increase the total value of the order to $2,819,720.81.

22.     On or about April 3, 2009, Intelligent Decisions paid approximately $2,706.20 for a golf outing for eight individuals, including Lim, in South Korea.

23.     On or about April 22, 2009, Intelligent Decisions paid approximately $258 for lunch for six individuals, including Lim, in Broadlands, Virginia.

24.     On or about May 8, 2009, in McLean, Virginia, Shim used his corporate credit card to purchase a set of golf clubs for Lim for $1,223.22.   Shim originally described this purchase on his expense report as "Per Harry [Martin], Golf set for Customer."   Shim later changed the description to "Donation for [Intelligent Decisions] sponsored Golf outing," after he was admonished by another employee of Intelligent Decisions.   Martin was made aware of the purchase of the golf clubs after it took place.

25.     On or about May 8, 2009, Martin used his corporate credit card to pay approximately $738.13 for a dinner for Martin, Shim, and Lim in Virginia.   On or about May 9, 2009, Martin used his corporate credit card to pay approximately $2,000 for drinks and entertainment in Virginia for Lim, Martin, and Shim.

26.     On or about May 9, 2009, Shim used his corporate credit card to pay approximately $17.60 for a breakfast for himself and Lim in Annandale, Virginia.   That same day, another Intelligent Decisions employee paid approximately $164 for a dinner for himself and Lim in McLean, Virginia.

27.     On or about May 18, 2009, with Lim's assistance, Intelligent Decisions obtained a modification of Purchase Order Number S352009-2 to extend the period of performance through September 9, 2009, and to increase the total value of the order to $1,348,776.03.

28.     In or around May 2009, Intelligent Decisions paid approximately $480 for a golf outing for four individuals, including Lim and Shim, in Sterling, Virginia.  On or about June 11, 2009, Intelligent Decisions paid approximately $525.86 for a golf outing for four individuals, including Lim and Shim, in South Korea.

29.     On or about June 11, 2009, Intelligent Decisions paid approximately $3,232.25 for a dinner for eight individuals, including Lim and Shim, in South Korea.

30.     On or about June 29, 2009, Intelligent Decisions paid approximately $2,047.81 for a first-class ticket upgrade for Lim.  An employee of Intelligent Decisions demanded that Lim repay the cost of the upgrade, and Lim did so.  Shim later paid Lim approximately $700 to partially compensate him for the cost of the upgrade.

31.     On July 23, 2009, Martin and Shim used their corporate credit cards to pay approximately $2,850 for drinks and entertainment in Virginia for Lim, Kwon, Martin, and Shim.  On July 25, 2009, Martin used his corporate credit card to pay approximately $444.35 for a dinner with Lim and Shim at a restaurant in Virginia.

32.     On or about August 5, 2009, Intelligent Decisions paid approximately $698.20 for a golf outing for four individuals, including Lim and Shim, in South Korea.

33.     On or about August 7, 2009, Intelligent Decisions paid approximately $1,344.13 for drinks and entertainment in South Korea for four individuals, including Lim and Shim.

34.    On or about August 19, 2009, an Intelligent Decisions employee paid approximately $1,498.46 for a dinner for 14 individuals, including Lim, in Fort Lauderdale, Florida.

35.    On or about November 15, 2009, Intelligent Decisions paid approximately $2182.40 to entertain several individuals, including Lim, at a professional football game in Landover, Maryland.  The cost attributable to Lim was approximately $453.87.  Shim traveled to and from the game with Lim using a car service paid for by Intelligent Decisions.  Martin was not present at the football game but authorized the expense prior to the game.

36.    On or about November 30, 2009, Martin used his corporate credit card to pay approximately $1,650.30 for a dinner for five individuals, including Lim and Shim.

37.    On or about December 2, 2009, Shim used his corporate credit card to pay approximately $71.44 for a dinner for three individuals, including Lim and Shim, in Virginia.

38.    On or about December 3, 2009, Shim used his corporate credit card to pay approximately $1,800 for drinks and entertainment for three individuals, including Lim and Shim, in Virginia.

39.    On or about February 11, 2010, Intelligent Decisions obtained a modification of Purchase Order Number S352009-1 to increase the total value of the order to $3,070,969.00.

40.    On or about March 12, 2010, Intelligent Decisions obtained a modification of Purchase Order Number S352009-1 to extend the period of performance through March 31, 2010, and to increase the total value of the order to $3,224,147.49.

41.    In sum, Intelligent Decisions provided Lim with meals, entertainment, golf outings, and golf equipment with a total value of approximately $10,458, in addition to a vehicle worth $30,723.52, for and because of Lim's official assistance to direct subcontracts to Intelligent Decisions and Lim's provision of preferential treatment for Intelligent Decisions with subcontracts awarded through the United States Department of the Army.

ATTACHMENT B

## **CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, Intelligent Decisions, Inc. (the "Company") has been engaged in discussions with the Office of the United States Attorney for the District of Columbia (the "Office") regarding issues arising in relation to certain improper payments to a United States public official for and because of the official's assistance to facilitate the award of subcontracts and the official's provision of preferential treatment with subcontracts for the Company; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Office; and

WHEREAS, the Company's President and Chief Executive Officer, Harry I. Martin, Jr., together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Office;

Therefore, the Board of Directors has RESOLVED that:

1.     The Company (a) acknowledges the filing of the one-count Information charging the Company with felony Gratuity, in violation of 18 U.S.C. § 201(c)(1)(A); (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Office; and (c) agrees to accept a monetary penalty against Company totaling $300,000, and to pay such penalty to the United States Treasury with respect to the conduct described in the Information;

2.     The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by

B-1

the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of Columbia; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.       The President and Chief Executive Officer of Company, Harry I. Martin, Jr., is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the President and Chief Executive Officer of Company, Harry I. Martin, Jr., may approve;

4.       The President and Chief Executive Officer of Company, Harry I. Martin, Jr., is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.       All of the actions of the President and Chief Executive Officer of Company, Harry I. Martin, Jr., which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: _____

By:     _____
        Corporate Secretary
        Intelligent Decisions, Inc.

B-3