**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

——————————————————————
                                                )
UNITED STATES OF AMERICA            )
                                                )
             v.                     ) Criminal No. 14-66 (EGS)
                                                )
SAENA TECH CORPORATION,             )
                                                )
             Defendant.             )
——————————————————————)
——————————————————————
                                                )
UNITED STATES OF AMERICA,           )
                                                )
             v.                     ) Criminal No. 14-211 (EGS)
                                                )
INTELLIGENT DECISIONS, INC.,        )
                                                )
             Defendant.             )
——————————————————————)

**MEMORANDUM OPINION**

>    The United States Attorney is the representative not of
> an ordinary party to a controversy, but of a sovereignty
> whose obligation to govern impartially is as compelling
> as its obligation to govern at all; and whose interest,
> therefore, in a criminal prosecution is not that it shall
> win a case, but that justice shall be done.

*Berger v. United States*, 295 U.S. 78, 88 (1935). Prosecutors are

provided with many tools to use in the pursuit of justice and

are granted significant discretion to decide how best to

approach each case. The pending cases involve one such tool: the

deferred-prosecution agreement ("agreement").

    The concept is simple: The government intends to prosecute a

defendant for criminal wrongdoing, but decides that the

defendant is worthy of a chance at rehabilitation and avoiding the collateral consequences that accompany a criminal conviction. Rather than seeking a conviction through a trial or guilty plea, the government agrees to defer prosecution for a period of time during which the defendant will be monitored for compliance with various conditions, in an attempt to assess the defendant's rehabilitation. If the defendant succeeds, the government does not prosecute. If the defendant does not succeed, the government may prosecute.

In these two cases, deferred-prosecution agreements are pending before the Court. These agreements are not, however, with individuals charged with criminal offenses, but rather with corporations. The government requests in both cases that this Court determine: (1) that the parties are entitled to an exclusion of time under the Speedy Trial Act; (2) that Saena Tech Corporation ("Saena Tech") and Intelligent Decisions, Inc. ("Intelligent Decisions") have presented adequate corporate representatives who have the ability to bind the corporations; and (3) that Saena Tech and Intelligent Decisions knowingly and voluntarily waived the right to indictment. No one disputes that the Court has the authority to make these determinations. These cases also present the question of the Court's role, if any, in determining whether the agreements should be approved at all.

The Court finds that the agreements in these two cases should be approved. Notwithstanding the government's opinion of the Court's limited role, the Court, as set forth *infra*, has the authority to assess the reasonableness of a deferred-prosecution agreement and to decline to approve agreements that are not genuinely designed to reform a defendant's conduct. This authority is limited by the strong separation-of-powers concerns that an overly-zealous judicial review of prosecutorial decisions would raise as well as a recognition of the expertise that the Executive Branch has in making such decisions. As discussed *infra*, Congress intended judicial scrutiny in the decision to divert prosecution.

Applying these principles to both cases, and upon consideration of the pleadings, the submission of the *amicus curiae* in the Saena Tech case, the applicable law, and the entire record, the Court **GRANTS** the motions for exclusion of time under the Speedy Trial Act and **APPROVES** both deferred-prosecution agreements, subject to periodic status hearings to monitor the defendants' compliance with those agreements. The parties are directed to file periodic reports to update the Court on the defendants' progress and compliance with the terms of the deferred-prosecution agreements in each case as set forth in the Orders accompanying this Memorandum Opinion.

In Part I of this opinion, the Court articulates the factual and procedural background for the two agreements. Part II sets forth the history of the statutory provision upon which deferred-prosecution agreements are based and concludes that court involvement in the deferral of prosecution was specifically intended by Congress. In Part III, the Court reviews the two District Court decisions that have examined the scope of judicial authority to consider deferred-prosecution agreements and analyzes the two sources of authority identified in those decisions: the Speedy Trial Act and the Court's supervisory power. In Part IV, the Court applies this framework to approve the agreements in the pending cases. In Part V, the Court discusses the extent to which the current use of deferred-prosecution agreements for corporations rather than individual defendants strays from Congress's original intent when it created an exclusion from the speedy trial calculation for the use of such agreements. The Court is of the opinion that increasing the use of deferred-prosecution agreements and other similar tools for eligible individual defendants could be a viable means to achieve reforms in our criminal justice system.

## I.    Background.

These cases arise out of a lengthy investigation into allegations of bribery in connection with certain government contracts. The investigation yielded a series of guilty pleas

beginning in 2012. Most notably, Kerry Khan, a former contracting official for the U.S. Army Corps of Engineers, pleaded guilty to bribery and conspiracy to commit money laundering, and accepted responsibility for more than $20,000,000 in bribe payments. *See* Plea Agreement, *United States v. Khan*, No. 11-cr-276, ECF No. 74 at 1-2. The investigation of Mr. Khan led to the discovery of another public official, In Seon Lim, who ultimately pleaded guilty to accepting bribes in exchange for favorable treatment of government contractors in connection with contracts with the United States Army. *See* Plea Agreement, *United States v. Lim*, E.D. Va. No. 14-cr-159, ECF No. 21.

The agreement in the Intelligent Decisions ("the Intelligent Decisions Agreement") case is rather standard. Intelligent Decisions has agreed to pay a fine and institute various compliance measures to prevent the recurrence of bribery offenses similar to the one with which it is charged. In exchange, the government will defer prosecution for a period of two years and dismiss all charges if Intelligent Decisions remains in compliance. The government has also charged and obtained guilty pleas from two employees of Intelligent Decisions in connection with the crime with which the company is now charged.

The agreement in the Saena Tech ("the Saena Tech Agreement") case is somewhat unusual. It is an agreement between not only the federal government and Saena Tech, but also Jin Seok Kim—the former Chief Executive Officer of Saena Tech who, according to the Statement of Facts, is the individual who personally paid the bribes Saena Tech is charged with paying. Mr. Kim has not been named in any criminal proceeding, yet the Saena Tech Agreement provides that prosecution of Saena Tech *and* Mr. Kim will be deferred for two years, provided that Saena Tech pays a fine and institutes a compliance program, and that Saena Tech and Mr. Kim cooperate in the government's ongoing investigation. Successful completion of that two-year term will result in the dismissal of any charges against Saena Tech. Mr. Kim thus receives the benefits of deferred prosecution without having been named in a criminal case.

A.   *United States v. Saena Tech Corp.*[1]

1.   *Factual Background Regarding Saena Tech.*

Saena Tech is a South Korean company that was founded by Mr. Kim in 2005. *See* Statement of Facts, ECF No. 5-1 at 18. Saena Tech "operated as a subcontractor for U.S.-based government contracting companies providing technical services and equipment

---

[1] Unless otherwise noted, the ECF citations in this section refer to documents filed in *United States v. Saena Tech Corp.*, No. 14-cr-66 (D.D.C. filed Mar. 24, 2014).

for the Eighth United States Army," which is based in South Korea. *Id.* One such contract involved the Program Executive Office Enterprise Information Systems ("PEO EIS"), an organization within the United States Army. *See id.*

Mr. Lim[2] was an Assistant Project Manager for a division of the PEO EIS known as the Project Manager, Defense Communications and Army Transmission Systems ("PM DCATS"). *See id.* at 18–19. Mr. Lim was employed in this position and based in Seoul, South Korea until approximately June 2010. *See id.* at 19. During his time in South Korea, Mr. Lim was the contracting officer for part of a contract ("the Prime Contract") with the Eighth United States Army, a position which gave him "influence over the selection of subcontractors who performed work under the Prime Contract." *Id.* at 19. Saena Tech ultimately obtained subcontracts to work on the Prime Contract from a variety of sources, including "Company F," the primary contractor for the Prime Contract, as well as three subcontractors, "Company E," "Company G," and Avenciatech. *See id.* at 19–20.

After coming into existence in 2005, Saena Tech began to perform subcontract work for the United States Army on a project that originated with the office at which Mr. Lim was employed. *See id.* at 20. Mr. Kim, then Saena Tech's CEO, met Mr. Lim at

---

[2] In Seon Lim is referred to as "Public Official C" in the Statement of Facts.

this time. *Id.* By early 2009, Saena Tech "was performing a subcontract for a project administered by [Mr. Lim]." *Id.* at 20. Mr. Kim soon "learned from [John Han] Lee that [Mr. Lim] wanted a car" and Mr. Lee "further informed Kim that Lee would make the arrangements for the purchase." *Id.* at 21. Mr. Kim agreed to contribute $10,000 toward the purchase of "a 2009 Lexus ES350 for [Mr. Lim] and to wire the [entire] purchase price of the Lexus." *Id.* Mr. Lim used the Lexus between March 2009 and June 2010, when he left South Korea. *See id.* Before leaving South Korea, Mr. Lim was unable to sell the Lexus, so Mr. Kim "gave Lee $25,000 in cash to purchase the Lexus," and Mr. Lee did so, without informing Mr. Lim that the money came from Mr. Kim. *See id.*

During the Spring of 2009, Mr. Lee suggested that Mr. Kim "should pay money to [Mr. Lim]," which caused Mr. Kim to believe that if he failed to do so, "Saena Tech's ability to retain subcontracts and obtain new ones based on merit would be jeopardized." *Id.* Accordingly, around September 2009, Mr. Kim gave Mr. Lim "approximately $40,000 in cash . . . to assist Saena Tech in obtaining and retaining subcontracting opportunities through subcontracts administered by [Mr. Lim] on behalf of the Army." *Id.* Around April 2010, Mr. Kim gave another $30,000 for the same purpose. *See id.*

Also around April 2010, Mr. Kim met with Mr. Lim and the Chief Executive Officer of Company G, one of the other subcontractors. *See id.* at 22. They "agreed that [Mr. Kim] would cause Saena Tech to submit an invoice to Company G for $250,000 for work purportedly performed by Saena Tech on a subcontract to Company G for work administered by [Mr. Lim]. . ." *Id.* They further agreed that Saena Tech would not be obligated to perform any actual work in exchange for that invoice. *See id.* Mr. Kim "agreed to pay to [Mr. Lim] the proceeds obtained from the fraudulent invoice, less 30% for taxes owed. . ." *Id.* In April 2010, Mr. Kim submitted the fraudulent invoice and paid $175,000, the proceeds less taxes, "to [Mr. Lim] in several installments between on or about April 9, 2010 and on or about May 6, 2010." *Id.*

The total amount of cash bribes paid by Mr. Kim on behalf of Saena Tech was approximately $280,000. *See id*. at 21-22. During the same time period, Mr. Kim also provided other things of value to Mr. Lim, including "meals and entertainment to assist Saena Tech in obtaining and retaining subcontracting opportunities through subcontracts administered by [Mr. Lim]." *Id.* Ultimately, Saena Tech obtained over fifteen subcontracts to perform work for the United States Army, between January 2009 and the present. *See id.* The amount of money Saena Tech earned on these contracts is unclear.

2.    *The Saena Tech Agreement.*

On March 24, 2014, the government filed a one-count

Information charging Saena Tech with bribery of a public

official in violation of 18 U.S.C. § 201. *See* Information, ECF

No. 1 at 2. The Information charged that Saena Tech gave various

things of value to Mr. Lim

> with the intent to influence official acts . . . to wit,
> Saena Tech gave, offered, and promised in excess of
> $250,000 in cash and other things of value, including
> meals and entertainment, to [Mr. Lim] and for [Mr. Lim's]
> benefit in return for [Mr. Lim] using [his] official
> assistance to direct subcontracts to Saena Tech and
> providing preferential treatment for Saena Tech with
> subcontracts awarded through the United States
> Department of the Army.

*Id.* at 1–2. Notably, Mr. Kim was not charged in any criminal

case.

On April 16, 2014, the government filed a joint motion "for

approval of deferred prosecution and exclusion of time under the

Speedy Trial Act." Mot. for Approval, ECF No. 5.[3] Attached to

that motion was the Saena Tech Agreement. *See* Deferred-

Prosecution Agreement, ECF No. 5-1. The Saena Tech Agreement is

between three parties: the U.S. Attorney for the District of

Columbia, Saena Tech, and Mr. Kim. *See id.* at 14–15.

---

[3] The parties have since clarified their intent to move, not for
Court approval of the Agreement itself, but for approval of the
requested exclusion under the Speedy Trial Act. *See* Consent Mot.
to Clarify, ECF No. 23. To clarify the record regarding the
government's view of this Court's authority, the Court **GRANTS**
that motion.

The Saena Tech Agreement, which was entered into by Mi Kyoung Lee, Chairperson of the Board of Directors, and Mr. Kim, Managing Director, provides that, in consideration of the "past and future cooperation" of Saena Tech and Mr. Kim, Saena Tech's payment of a fine, and Saena Tech's implementation of a corporate-compliance program, "any prosecution of the Company and Mr. Kim . . . be and hereby is deferred. . ." *Id.* at 9. The term of deferral is two years from "the date on which the Information is filed." *Id.* at 3. Saena Tech also admitted to the truth of the facts set forth in the Statement of Facts and agreed that "[s]hould [the U.S. Attorney's Office] pursue the prosecution that is deferred by this Agreement, the Company . . . will neither contest the admissibility of nor contradict the Statement of Facts." *Id.* at 3. There is no parallel statement as to the government's potential use of the Statement of Facts against Mr. Kim. In the event that the U.S. Attorney's Office were to determine, "in its sole discretion," that either Saena Tech or Mr. Kim breached the Agreement, "[they] shall thereafter be subject to prosecution. . ." *Id.* at 9. Finally, "by signing this Agreement, [Saena Tech] and Mr. Kim agree that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term [of the Agreement] plus one year." *Id.* at 10.

The Saena Tech Agreement creates three obligations necessary to obtain the deferral:

*Cooperation*: Mr. Kim and Saena Tech must cooperate in ongoing investigations by: (1) "[t]ruthfully disclos[ing] all factual information not protected by [certain privileges] with respect to" activities of Saena Tech, and related entities and individuals, "concerning all matters relating to corrupt payments in connection with United States government contracts"; (2) "designat[ing] knowledgeable employees, agents, or attorneys to provide to the Office the [relevant] information and materials"; (3) "us[ing] . . . best efforts to make available for interviews or testimony . . . present or former officers, directors, employees, agents and consultants of the Company"; and (4) for Mr. Kim, "agree[ing] to travel to the United States for interviews or testimony as requested." *Id.* at 4–5.

*Fine*: Saena Tech agreed to pay a $500,000 fine "within ten . . . days of the filing of the Information." *Id.* at 6. That fine, the Saena Tech Agreement declares, "is appropriate given the facts and circumstances of this case." *Id.*

*Compliance Program*: Saena Tech agreed to implement "a compliance and ethics program designed to prevent and detect violations of the applicable anti-corruption laws throughout its operations. . ." *Id.* at 8. The Saena Tech Agreement requires changes to "ensure that the Company maintains: (a) a system of

12

internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance code, standards, and procedures designed to detect and deter violations of the applicable anti-corruption laws." *Id.*

   3.   *Procedural History of United States v. Saena Tech.*

   The Court scheduled a status hearing for May 7, 2014 to "determine the process and procedures that will apply to further proceedings regarding the joint motion for approval of the deferred-prosecution agreement." Minute Order of April 29, 2014. At that status hearing, the Court indicated that it would not consider the Saena Tech Agreement without first receiving in-person testimony from a corporate officer with the ability to bind Saena Tech and to testify regarding the provisions of the deferred-prosecution agreement as well as the underlying facts. The Court also required Saena Tech to submit corporate documents proving that its representative had the authority to bind the corporation.

   On June 3, 2014, Saena Tech filed various corporate documents to demonstrate its approval of the Saena Tech Agreement and to demonstrate that Ms. Lee, its Chief Executive Officer—who is also Mr. Kim's wife—has the authority to bind the corporation. *See* Notice of Filing, ECF No. 13. These included Saena Tech's Articles of Incorporation and a resolution of Saena Tech's Board

of Directors approving the deferred-prosecution agreement. *See*
Articles of Incorp., ECF No. 13-3; Resolution, ECF No. 13-5. The
resolution reflects that Saena Tech's "directors' meeting" was
attended by only two directors: Ms. Lee and Mr. Kim. *See*
Resolution, ECF No. 13-5 at 2.

On June 6, 2014, the Court directed Saena Tech "to file
evidence of its new corporate-compliance program." Minute Order
of June 6, 2014. Saena Tech filed responsive documents regarding
its compliance program on June 12, 2014 and June 16, 2014. *See*
Proffer, ECF No. 16; Proffer Replacement Doc., ECF No. 17. In
these documents, Saena Tech asserts that it has taken six steps
in furtherance of its obligations:

- *Appointment of Compliance Officer*: Saena Tech appointed
  Choondong Lee as Internal Compliance Officer, "to carry out
  the responsibility of implementing and supervising a
  corporate-compliance and ethics program." Proffer, ECF No.
  16 at 1-2; *see also* Board of Directors Resolution, ECF No.
  16-1.

- *Creation of Internal Control System*: Choondong Lee has
  "established and implemented an internal control system."
  Proffer, ECF No. 16 at 2. This system requires the
  Compliance Officer to monitor company actions and ensure
  that only authorized individuals are engaging in company
  transactions and using company assets, and that accounting
  and inventory audits are regularly and accurately done. *See*
  Report, ECF No. 16-2 at 3-4. The Compliance Officer is also
  required to file monthly reports with Saena Tech's auditor.
  *Id*.

- *Establishment of Hotline*: Saena Tech created a "Corporate
  Compliance Hotline . . . to provide Saenatech's [sic]
  employees with a means by which to raise their concerns and
  to report possible wrongdoing" using a confidential

procedure that will be investigated by Saena Tech's outside counsel. *See* Proffer, ECF No. 16 at 2; ECF No. 16-3 at 2.

- *Design of Code of Conduct*: Saena Tech contracted with a law firm "to draft a Code of Conduct, Standards and Compliance in furtherance of the requirements of the DPA." Proffer, ECF No. 16 at 2; *see also* Contract, ECF No. 16-4. The Code of Conduct consists of a 24-slide PowerPoint presentation. *See* ECF No. 17-1. It provides guidance regarding various potential ethical issues, including Saena Tech's commitment not to retaliate against those who expose ethical issues, how to respond to and report ethical and legal concerns, how to approach business-related gifts, and Saena Tech's prohibition on the payment of bribes. *See id.*

- *Holding a Seminar Series*: Choondong Lee has conducted the first of what will be a periodic seminar series "for all employees for the purpose of instructing them with regard to anti-corruption and corporate-compliance issues." Proffer, ECF No. 16 at 3; *see also* Report, ECF No. 16-8.

- *Appointment of New Compliance Officer*: Saena Tech appointed its outside counsel, Sucheol Noh, to serve as the company's auditor "to carry out more professional checking and balancing" because "[t]he former Inspector had been a relative of Mr. Kim and Ms. Lee." Proffer, ECF No. 16 at 3; *see also* Stockholders Minutes, ECF No. 16-9.

The Court commenced the July 17, 2014 hearing by expressing a few concerns regarding the deferred-prosecution agreement. *See* Tr. of July 17, 2014 Status Hearing, ECF No. 38 at 4:11–7:11. Specifically, the Court noted that the agreement appears to "essentially ha[ve] the effect of immunizing Mr. Kim" and that this raises concerns regarding the "fundamental fairness of this agreement" in light of the guilty pleas and criminal records that have resulted for other defendants charged in the investigation. *Id.* at 4:11–25. The government responded to the Court's concerns, conceding that the agreement "essentially

offers Mr. Kim letter immunity, but it's contingent upon his cooperation." *Id.* at 7:16-17. Regarding the fairness of the Saena Tech Agreement, the government agreed that this is "certainly a better ride than the other defendants," *id.* at 9:12-13, but noted what the government considered in making its decision: (1) "Saena Tech is a Korean corporation . . . does its work in Korea; no work in the United States at all. Mr. Kim is a Korean national, did his work for Saena Tech in South Korea, was not doing work here in the U.S., and so there are obstacles with regard to a prosecution"; (2) "Mr. Kim's cooperation is extremely important to the Government with regard to [Mr. Lim's] case . . . and with regard to potential[] future cases"; (3) Mr. Kim "volunteered a lot of the information that Your Honor sees in the statement of offense"—"information the Government did not know"; and (4) "this company is almost assuredly going to be permanently debarred" from government contracts. *See id.* at 9:24-12:25.

After this discussion, the Court noted that the case was "nontraditional" in that "[t]here's no one else in the courtroom raising concerns" and "the Court cannot be an advocate." *Id.* at 19:13-19. The Court indicated that it would appoint an *amicus curiae* to fill that role. *See id.* at 26:7-20. Accordingly, the Court proceeded with a colloquy with Mr. Kim and Ms. Lee, as Saena Tech's corporate representative, and "defer[red] the

question of acceptance or rejection to another date." *Id.* at
26:21-25. The Court engaged both Ms. Lee and Mr. Kim in a
colloquy regarding their understanding of the Saena Tech
Agreement, their agreement to the truth of the Statement of
Facts, their waivers of conflicts of interest in connection with
the joint representation, and, in the case of Ms. Lee, her
waiver of indictment and speedy trial, and ability to bind the
corporation. *See id.* at 41:16-71:1.

   After the hearing, the Court appointed Professor Brandon L.
Garrett of the University of Virginia School of Law to serve,
along with Dean Alan Morrison of The George Washington
University Law School as his local counsel, "as amicus curiae to
respond to the parties' arguments and provide the Court with
advocacy in favor of broader court authority, vel non, to
consider issues including the fairness and reasonableness of a
deferred-prosecution agreement in deciding whether to accept or
reject a deferred prosecution-agreement."[4] Minute Order of July
21, 2014. The government filed its supplemental brief,
responding to the concerns raised by the Court, on August 8,
2014. *See* Gov't's Suppl. Br., ECF No. 26. The defendant filed a
"letter in lieu of a more formal brief" indicating that it and
Mr. Kim concur with the government's brief. *See* Letter, ECF No.

---

[4] The Court appreciates the helpful suggestions and illuminating
analysis provided by *amicus curiae*.

25-1 at 1. The *amicus* filed his brief on August 22, 2014. *See*

Amicus Br., ECF No. 31. The government filed a brief in response

to the *amicus*'s filing on August 29, 2014. *See* Reply, ECF No.

32.

A motion hearing regarding approval of the deferred-

prosecution agreement was held on September 5, 2014. Counsel for

the government and Saena Tech, as well as the court-appointed

*amicus curiae*, presented argument during that hearing. After the

hearing, the Court entered the following Minute Order regarding

two questions that had arisen during the hearing:

> In accordance with the discussion held on the record
> during the September 5, 2014 motion hearing, the parties
> are directed to file supplemental briefs addressing the
> following issues: (1) whether, after a Court approves an
> exclusion of time under Section 3161(h)(2) of the Speedy
> Trial Act, the Court has any authority to hold a defendant
> that is party to the relevant deferred-prosecution
> agreement in contempt for failing to comply with the
> agreement's provisions; and (2) whether the Court may
> order a party to a deferred-prosecution agreement to
> comply with the provisions of that agreement in
> connection with a colloquy regarding that party's
> understanding of the agreement and relinquishment of its
> constitutional and statutory right to a speedy trial.

Minute Order of September 5, 2014. The government filed its

brief on October 13, 2014. *See* Gov't's Suppl. Br., ECF No. 35.

The *amicus curiae* filed his brief on October 21, 2014. *See*

Amicus Suppl. Br., ECF No. 36.

B.   *United States v. Intelligent Decisions, Inc.*[5]

    1.   *Factual Background Regarding Intelligent Decisions.*

Intelligent Decisions is an information-technology company based in Ashburn, Virginia, which conducts "the vast majority" of its business with the United States government. *See* Statement of Facts, ECF No. 3-2 at 18. Harry Martin, Jr. was the founder, President, CEO, and owner of Intelligent Decisions, while Chae Shim was the company's Director of Acquisition Accounts for the Asia/Pacific region. *See id*. Both Mr. Martin and Mr. Shim were provided with corporate credit cards by Intelligent Decisions. *See id.*

Intelligent Decisions' involvement in the bribery scheme is similar to that of Saena Tech. Like Saena Tech, it sought to obtain contracts related to the PEO EIS organization within the United States Army. *See id.* at 19. Also like Saena Tech, Intelligent Decisions' interactions were with Mr. Lim in his capacity as Assistant Project Manager for the PM DCATS division of the PEO EIS. *See id*. at 19.

Intelligent Decisions ultimately replaced another company in providing an Information Technology Help Desk subcontract on the same Prime Contract that Mr. Lim was supervising and in which

---

[5] Unless otherwise noted, the ECF citations in this section refer to documents filed in *United States v. Intelligent Decisions, Inc.*, No. 14-cr-211 (D.D.C. filed October 10, 2014).

Saena Tech was involved. *See id.* at 20. During this time, Saena Tech "operated as a subcontractor for Intelligent Decisions" as well as other companies. *Id.* Intelligent Decisions was involved in the help desk subcontract from January 2009 until March 2010. *Id.*

In January 2009, John Han Lee, an employee of the company that was then-servicing the help desk subcontract, approached Mr. Martin and Mr. Shim with the opportunity to take over the subcontract. *Id.* at 21. Mr. Shim and Mr. Martin then traveled to South Korea to meet with Mr. Lim. *See id.* On approximately January 23, 2009, Mr. Martin paid $553.03 for dinner with Mr. Lim and Mr. Shim, among others, and Mr. Shim paid $2,382.49 for drinks and entertainment with Mr. Martin and Mr. Lim, among others. *See id.* Both payments were made using Intelligent Decisions' corporate credit cards. *See id.* On January 30, 2009, Intelligent Decisions was awarded the help desk contract with Mr. Lim's assistance. *Id.* The contract was worth $525,000, and a second contract obtained by Intelligent Decisions was worth $67,294.40. *Id.* Intelligent Decisions also agreed to hire Mr. Lee and two other individuals to work on the subcontracts. *Id.*

For the remainder of 2009, Intelligent Decisions paid a number of expenses on behalf of Mr. Lim. *See id.* at 22–26. The total came to over $10,000 in meals, entertainment, golf outings, and golf equipment, as well as a vehicle worth over $30,000. *See id.*

at 26. In exchange, Intelligent Decisions obtained modifications

to the existing subcontracts, which increased their values

significantly. *See id.* at 23–25.

Mr. Shim is no longer with the company. He pleaded guilty

before this Court to one count of felony gratuity in violation

of 18 U.S.C. § 201(c)(1)(A), and was sentenced to two years of

probation. *See* Plea Agreement, *United States v. Chae Shim*, No.

14-cr-182 (D.D.C. filed Nov. 6, 2014), ECF No. 8 at 1; J.,

*United States v. Chae Shim*, No. 14-cr-182 (D.D.C. filed April

17, 2015), ECF No. 27 at 2. Mr. Martin resigned as Chairman and

CEO of Intelligent Decisions, pleaded guilty before this Court

to one count of felony gratuity in violation of 18 U.S.C. §

201(c)(1)(A), and was sentenced to three years of probation and

a fine of $250,000. *See* Plea Agreement, *United States v. Harry

Martin*, No. 14-cr-210 (D.D.C. filed Nov. 24, 2014), ECF No. 4 at

1; J., *United States v. Harry Martin*, No. 14-cr-210 (D.D.C.

filed Mar. 20, 2015), ECF No. 27 at 2, 4.

        2.    *The Intelligent Decisions Agreement.*

On October 15, 2014, the government filed a one-count

Information charging Intelligent Decisions with paying a

gratuity to a public official in violation of 18 U.S.C. § 201.

*See* Information, ECF No. 1 at 1. The Information charged that

Intelligent Decisions gave various things of value to Mr. Lim

> because of an official act performed and to be performed
> by In Seon Lim . . . that is, Intelligent Decisions gave,
> offered, and promised to In Seon Lim over $10,000 in
> meals, entertainment, golf outings, and golf equipment,
> and a vehicle worth over $30,000, for and because of
> Lim's official assistance to direct subcontracts to
> Intelligent Decisions and Lim's provision of
> preferential treatment for Intelligent Decisions with
> subcontracts awarded through the United States Army.

*Id.*

On October 28, 2014, the government filed a joint motion for exclusion of time under the Speedy Trial Act. *See* Joint Mot., ECF No. 3-1 at 1. Attached to that motion was the Intelligent Decisions Agreement. *See* Deferred-Prosecution Agreement, ECF No. 3-2. The Intelligent Decisions Agreement provides that, in exchange for Intelligent Decisions' cooperation, its payment of a fine, and its implementation of a corporate-compliance program, prosecution of Intelligent Decisions will be deferred for a term of two years. *See id.* at 3, 4. Intelligent Decisions admitted, in entering into the Agreement, to the truth of the Statement of Facts, and also agreed that "[s]hould [the U.S. Attorney's Office] pursue the prosecution that is deferred by this Agreement, the Company . . . will not contradict anything in the Statement of Facts at any such proceeding." *Id.* at 3. In the event that the U.S. Attorney's Office were to determine, "in [its] sole discretion," that Intelligent Decisions breached the Agreement, it "shall thereafter be subject to prosecution." *Id.* at 10. Finally, the Intelligent Decisions Agreement provides

that "by signing this Agreement, [Intelligent Decisions] agrees
that the statute of limitations with respect to any such
prosecution that is not time-barred on the date of the signing
of this Agreement shall be tolled for the Term [of the
Agreement] plus one year." *Id.* at 10.

Much like the Saena Tech Agreement, the Intelligent Decisions
Agreement imposes three obligations on the company that are
necessary to obtain the deferral:

*Cooperation*: Intelligent Decisions must cooperate fully in any
"investigation of the Company and its affiliates . . . in any
and all matters relating to the conduct described in the
Agreement and [Statement of Facts]. . ." *Id.* at 4. The company
must (1) "truthfully disclose all factual information not
protected by [certain privileges]"; (2) designate knowledgeable
employees, agents, or attorneys to provide to the Office the
[relevant] information and materials"; (3) "use its best efforts
to make available for interviews or testimony . . . present or
former officers, directors, employees, agents and consultants of
the Company"; and (4) "consent to any and all disclosures . . .
as the Office, in its sole discretion, shall deem appropriate."
*Id.* at 5-6.

*Fine*: Intelligent Decisions agreed to pay a $300,000 fine
within ten days of the filing of the Information. *Id.* at 7. That

fine, the Intelligent Decisions Agreement declares, "is appropriate given the facts and circumstances of this case." *Id.*

*Compliance Program*: Intelligent Decisions agreed to implement "a compliance and ethics program designed to prevent and detect violations of 18 U.S.C. § 201 and other applicable anti-corruption laws throughout its operations." *Id.* at 8. The Intelligent Decisions Agreement requires that it undertake a review of its "existing internal accounting controls, policies, and procedures regarding compliance with anti-corruption laws" and "adopt new or modify existing internal controls, policies, and procedures" to maintain: "(a) a system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance code, standards, and procedures designed to detect and deter violations of the applicable anti-corruption laws." *Id.* at 8-9.

   3.   *Procedural History of United States v. Intelligent Decisions, Inc.*

On November 13, 2014, the Court held a status hearing "to discuss the procedures that will govern the Court's review and consideration" of the Joint Motion for approval. Minute Order of October 28, 2014. The Court then ordered a hearing to "conduct a colloquy with one or more corporate officers of defendant Intelligent Decisions." Minute Order of November 13, 2014. The

Court also ordered that this hearing would follow procedures similar to the Saena Tech case: "one or more corporate officers with authority to bind Intelligent Decisions and familiarity with the deferred-prosecution agreement and attached statement of facts shall appear at that hearing" and "Intelligent Decisions is directed to file . . . copies of documentation sufficient to show that the corporate officers who will appear at the January 8 hearing have the authority to speak on behalf of and to bind the corporation." *Id.* The hearing was scheduled for January 8, 2015. *See id.*

The Court also ordered Intelligent Decisions to review the pleadings filed in the *Saena Tech* case related to the scope of the Court's authority to accept or reject deferred-prosecution agreements. *Id*. The Court requested that the defendant address the issues raised by the Court in *Saena Tech*. *See id.* Intelligent Decisions filed a brief addressing these issues on January 5, 2015. *See* Def.'s Br., ECF No. 8. The Court held a hearing on January 15, 2015, at which time the Court conducted a colloquy similar to that in the Saena Tech case, and indicated that it would take the Intelligent Decisions Agreement under advisement. *See* Minute Entry of January 15, 2015.

## II.  Legislative History of the Speedy Trial Act's Provisions Related to Deferred-Prosecution Agreements.

The relevant legislative history demonstrates that deferred-prosecution agreements were originally intended to give prosecutors the ability to defer prosecution of individuals charged with certain non-violent criminal offenses to encourage rehabilitation. At this time, however, and as discussed in detail in Part V of this Opinion, deferred-prosecution agreements appear to be offered relatively sparingly to individuals, and instead are used proportionally more frequently to avoid the prosecution of corporations, their officers, and employees.

### A.  The Legislative History of the Speedy Trial Act Reflects an Intent to Permit the Deferral of Individual Prosecutions in an Effort to Facilitate Rehabilitation.

The Speedy Trial Act permits an exclusion from the speedy trial calculation of "[a]ny period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct." 28 U.S.C. § 3161(h)(2). It is this sentence that forms the basis for deferred-prosecution agreements. Without it, prosecutors would have difficulty bringing a case onto a court's docket and thereby obtaining the

benefit of the pending criminal charge and potential court supervision of the defendant.

The legislative history of the Speedy Trial Act demonstrates that Congress intended to provide a tool to assist in rehabilitating individuals, modeled on successful deferred prosecution programs in New York City and the District of Columbia. In 1969, then-Representative Abner Mikva introduced a bill that ultimately became the Speedy Trial Act. *See* Anthony Partridge, Fed. Judicial Ctr., Legislative History of Tile I of the Speedy Trial Act of 1974 at 19 (1980), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/lhiststa.pdf/$file/lhiststa.pdf. The bill introduced by Representative Mikva ("Mikva Bill") contained speedy trial exclusions, similar to those ultimately codified in Section 3161(h) of the Speedy Trial Act. *See id.* at 116. Those exclusions included what would become Section 3161(h)(2), but omitted court involvement in the deferral process. *See id.* at 280-81 (excluding "[t]he period of delay during which prosecution is deferred by the United States attorney pursuant to written agreement with the defendant for the purpose of allowing the defendant to demonstrate his good conduct" in "computing the time for trial").

In 1970 and again in 1971, Senator Sam Ervin introduced his own speedy trial legislation. *See id.* at 13-14. With the exception of corrections for cross references, the two bills –

as introduced – were identical. *See id.* at 5. The 1970 bill
introduced by Senator Ervin ("Ervin Bill") included an exclusion
for "[a]ny period of delay during which prosecution is deferred
by the United States attorney pursuant to written agreement with
the defendant for the purpose of allowing the defendant to
demonstrate his good conduct." *Id.* at 288. The lack of court
involvement in this provision generated some debate. During a
hearing on the 1971 Ervin Bill, Former Assistant U.S. Attorney
Daniel A. Reznick submitted a prepared statement arguing that
"the words 'with the approval of the court' should be inserted."
*Id.* at 116. Mr. Reznick stated:

> This provision, which recognizes and encourages the
> deferral of prosecution pursuant to written agreement
> with a defendant that he will demonstrate his good
> conduct, is desirable. Since it has some of the elements
> of a plea bargain and does result in a pro tanto waiver
> of the defendant's right to a speedy trial, approval by
> the court on the record is a wise and necessary
> safeguard.

*Id.*

The 1971 Ervin Bill was pending before the Constitutional
Rights Subcommittee of the Senate Judiciary Committee in 1972
when language requiring court approval of the deferral was added
via amendment. *See id.* at 5, 299 (excluding "[a]ny period of
delay during which prosecution is deferred by the attorney for
the Government pursuant to written agreement with the defendant,
with the approval of the court, for the purpose of allowing the

defendant to demonstrate his good conduct"). The same version of
the bill was introduced again in 1973, and it was reported out
by the Senate Judiciary Committee in 1974. *See id.* at 314. The
Senate Judiciary Committee's Report on that provision provides
the explanation of its purpose:

> *Subparagraph 3161(h)(2)* is designed to encourage the
> current trend among United States attorneys to allow for
> deferral of prosecution on the condition of good
> behavior. A number of Federal and State courts have been
> experimenting with pretrial diversion or intervention
> programs in which prosecution of a certain category of
> defendants is held in abeyance on the condition that the
> defendant participate in a social rehabilitation
> program. If the defendant succeeds in the program,
> charges are dropped. Such diversion programs have been
> quite successful with first offenders in Washington,
> D.C. (Project Crossroads) and in New York City
> (Manhattan Court Employment Project). Some success has
> also been noted in programs where the defendant's
> alleged criminality is related to a specific social
> problem such as prostitution or heroin addiction. Of
> course, in the absence of a provision allowing the
> tolling of the speedy trial time limits, prosecutors
> would never agree to such diversion programs. Without
> such a provision the defendant could automatically
> obtain a dismissal of charges if prosecution were held
> in abeyance for a period of time in excess of the time
> limits set out in section 3161(b) and (c). This section
> of S. 754 differs from its counterpart in S. 895. It now
> requires that exclusion for diversion only be allowed
> where deferral of prosecution is conducted "with
> approval of the court." This assures that the court will
> be involved in the decision to divert and that the
> procedure will not be used by prosecutors and defense
> counsel to avoid the speedy trial time limits.

*Id.* at 117 (quoting S. Rep. No. 93-1021, at 36–37 (1974)). The
bill that was reported out by the Senate Judiciary Committee was
ultimately passed by the Senate on July 23, 1974 and signed by

the President on January 3, 1975, becoming Public Law No. 93-
619. *See id.* at 15, 6. Section 3161(h)(2) was not altered in any
way after it was approved by the Senate Judiciary Committee. *See
id.* at 116.[6] Nor did the 1979 Amendments to the Speedy Trial Act
affect Section 3161(h)(2). *Id.*

The legislative history thus demonstrates that Court
involvement in the deferral of a prosecution was specifically
intended by Congress when it passed this legislation. The Court
analyzes the contours of that involvement in Part III of this
Opinion.

---

[6] The House Judiciary Committee received some pushback from the
Department of Justice regarding the requirement of court
approval, but did not act on it. In the exhibit to Assistant
Attorney General W. Vincent Rakestraw's 1974 testimony, the
Department commented:

> In juvenile matters the Attorney General presently
> authorizes U.S. Attorneys to utilize the so-called
> "Brooklyn Plan" for deferred prosecution, and in some
> pilot districts a program of deferred prosecution of
> adults has been initiated under the Executive Authority
> of the Attorney General. Neither of the foregoing
> deferred plans for prosecution require approval of the
> court. Involving the court in this type of prosecutorial
> decision would seemingly violate the doctrine of
> separation of powers . . . . Because of the foregoing
> reasons, it is proposed that the language "with the
> approval of the court" be deleted.

*Id.* at 117-18.

## III. The Court's Role When Presented with a Deferred-Prosecution Agreement.

### A.   Decisions in *United States v. HSBC* and *United States v. Fokker Services*.

There is no dispute that the government is empowered to offer deferred-prosecution agreements to the defendants in these cases. The question is the Court's role in reviewing and approving those agreements. Two District Court opinions have addressed the source and scope of a district court's authority to review a deferred-prosecution agreement. *See United States v. Fokker Servs., B.V.*, 79 F.Supp.3d 160 (D.D.C. 2015), *appeals docketed*, Nos. 15-3016, 15-3017 (D.C. Cir. filed Feb. 23, 2015); *United States v. HSBC Bank USA*, No. 12-cr-763, 2013 WL 3306161 (E.D.N.Y. July 1, 2013). As commentators have noted, "nearly every . . . DPA that the government has negotiated with a U.S. company has been approved without judicial modification." Peter Reilly, *Negotiating Bribery: Toward Increased Transparency, Consistency, and Fairness in Pretrial Bargaining Under the Foreign Corrupt Practices Act*, 10 Hastings Bus. L.J. 347, 393 (2014); *see also* Brandon L. Garrett, *Structural Reform Prosecution*, 93 Va. L. Rev. 853, 922 (2007) (noting, prior to the issuance of the *HSBC* decision, that "[e]very judge approving a deferred prosecution agreement has done so without any published rulings or modifications to the agreement"). Judge John Gleeson's decision in *HSBC* was apparently the first in

which a District Court Judge declined to automatically approve a deferred-prosecution agreement, while Judge Richard Leon's Opinion in *Fokker* was the first rejection of a deferred-prosecution agreement. These decisions provide helpful insight for this Court's assessment of its authority regarding the two pending agreements. The Court therefore reviews each decision in some detail.

    1.   *United States v. HSBC.*

Judge Gleeson's decision in *United States v. HSBC Bank* was the first written decision to address this issue, and it identified the potential sources of a court's authority to consider whether to approve deferred-prosecution agreements. In that case, Judge Gleeson was presented with an agreement entered into in connection with charges that HSBC "willfully fail[ed] to maintain an effective anti-money laundering . . . program" and "willfully facilitate[ed] financial transactions on behalf of sanctioned entities." *HSBC*, 2013 WL 3306161, at *1. The government entered into a deferred-prosecution agreement with HSBC, which "request[ed] that the Court hold the case in abeyance for five years . . . and exclude that time pursuant to 28 U.S.C. § 3161(h)(2) from the 70-day period within which trial must otherwise commence." *Id.*

Judge Gleeson first concluded that the court's authority in addressing a deferred-prosecution agreement has a different

basis than its authority in connection with guilty pleas or
pleas of *nolo contendere*. *Id.* at *2. Federal Rule of Criminal
Procedure 11(c)(1)(A), which provides for some court oversight
of government dismissals of charges "[i]f the defendant pleads
guilty or nolo contendere," and Section 6B1.2 of the United
States Sentencing Guidelines, which provides standards for a
court's acceptance of a plea agreement, did not apply, according
to Judge Gleeson, because the defendant "has not agreed to plead
guilty or *nolo contendere* to any of the charged offenses . . .
Nor has the government agreed to dismiss other charges in
exchange for a plea of guilty." *Id.* at *2.

Judge Gleeson identified two possible sources of authority:
the Speedy Trial Act, which permits the parties in a criminal
case to obtain an exclusion of time pursuant to agreements to
defer prosecution, and the Court's supervisory power. *See id.* at
*2–7. Judge Gleeson found that the Speedy Trial Act
unequivocally contemplates a district court's participation in
the process to approve a deferred-prosecution agreement and that
this approval requirement "is grounded in a concern . . . that
parties will collude to circumvent the speedy trial clock,"
meaning that courts must "consider whether a deferred-
prosecution agreement is truly about diversion and not simply a
vehicle for fending off a looming trial date." *Id.* at *3. The
Court's supervisory power provides additional authority, Judge

Gleeson concluded, because "[b]y placing a criminal matter on the docket of a federal court, the parties have subjected their DPA to the legitimate exercise of that court's authority." *Id.* at *5. Judge Gleeson ultimately approved the deferred-prosecution agreement pursuant to the Court's supervisory power. *See id.* at *1,7 – 11. Judge Gleeson observed that "[a]s long as the government asks the Court to keep this criminal case on its docket, the Court retains the authority to ensure that the implementation of the DPA remains within the bounds of lawfulness and respects the integrity of this Court." *Id.* at *11. Pursuant to this authority, Judge Gleeson directed the parties to file quarterly reports "with the Court to keep it apprised of all significant developments in the implementation of the DPA. Doubts about whether a development is significant should be resolved in favor of inclusion." *Id.*

    2.    *United States v. Fokker Services.*

Judge Leon relied on the *HSBC* decision when he issued the first decision declining approval of a deferred-prosecution agreement. *See Fokker*, 79 F.Supp.3d 160. In that case, Fokker Services, a Dutch aerospace services provider, was charged with violating export laws from 2005 until 2010 by engaging in transactions with sanctioned countries including Iran, Burma, and Sudan. *Id.* at 162. The United States and Fokker Services entered into an agreement whereby Fokker Services: (1) accepted

responsibility for its conduct, and (2) agreed to pay
$10,500,000; to cooperate with the government; to implement a
new compliance program; and to comply with export laws going
forward. The agreement further provided that if the company were
to fulfill these conditions over the course of eighteen months,
the government would dismiss the charges. *Id.* at 164.

Relying on *HSBC*, Judge Leon found that a plain reading of the
Speedy Trial Act calls for a district court to play a role in
approving the agreement. *Id*. He also "agreed with [Judge
Gleeson's] well-reasoned conclusion that a District Court has
the authority 'to approve or reject the DPA pursuant to its
supervisory power.'" *Id*. at 165 (quoting *HSBC*, 2013 WL 3306161,
at *4). "One of the purposes of the Court's supervisory powers,"
Judge Leon wrote, "is to protect the integrity of the judicial
process." *Id*. While Judge Leon recognized the government's
discretion to choose not to prosecute a case, he emphasized that
the government *chose* to charge Fokker, and asked the court to
lend its "judicial imprimatur" to the deferred-prosecution
agreement. *Id*. He therefore found that "it is this Court's duty
to consider carefully whether that approval should be given."
*Id*.

Based on these two sources of authority, Judge Leon concluded
that the agreement presented in *Fokker* was not an appropriate
exercise of prosecutorial discretion because the agreement was

"grossly disproportionate to the gravity of Fokker Services'
conduct." *Id.* at 167. In arriving at this conclusion, Judge Leon
observed that "the integrity of the judicial proceedings would
be compromised by giving the Court's stamp of approval to either
overly-lenient prosecutorial action, or overly-zealous
prosecutorial conduct." *Id.* at 166. Fokker Services had
allegedly violated export laws for five years and earned more
revenue than it agreed to pay in fines. Judge Leon took issue
with the short compliance period, the low fine, and the lack of
an independent compliance monitor. *Id.*

                         *     *     *

These two cases inform the Court's analysis of its authority
to approve these two deferred-prosecution agreements. The Court
agrees that the Speedy Trial Act and the judiciary's supervisory
power appear to be the only potential sources of court authority
to review deferred-prosecution agreements. During the September
5, 2014 hearing in the *Saena Tech* case, the Court raised the
possibility that it could derive authority to punish failure to
comply with a deferred-prosecution agreement from either the
fact of having approved an exclusion under the Speedy Trial Act
or from a specific Court Order directing compliance with the
agreement's provisions. Because the Court is not currently
presented with any information indicating that either defendant

has failed to comply with their respective agreements, the Court need not address whether it has this authority at this time.

**B.   Review of a Deferred-Prosecution Agreement Must Recognize the Expertise of Prosecutors and the Separation-of-Powers Concerns Inherent in Judicial Review of Charging Decisions.**

It is well established that the Executive Branch has broad discretion to decide when to initiate criminal proceedings. *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) ("The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see the faithful execution of the laws"); *see also Interstate Commerce Comm'n v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987) ("it is entirely clear that the refusal to prosecute cannot be the subject of judicial review"). This "broad discretion" is deserved, in part, because the Executive Branch— exercising its responsibility to take care that the laws be faithfully executed—must take a variety of factors into consideration. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Wayte v. United States*, 470 U.S. 598, 607 (1985). Indeed, "[t]o mandamus a particular prosecution . . . would

normally be very difficult, for a prosecutor may lawfully take account of many factors other than probable cause in making such decisions." *Nader v. Saxbe*, 497 F.2d 676, 679 n.18 (D.C. Cir. 1974).

As such, the decision to prosecute is "particularly ill-suited to judicial review." *Wayte*, 470 U.S. at 607. Thus, "'[t]he presumption of regularity supports' . . . prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)); *see also Nader*, 497 F.2d at 679 n.18 ("The federal courts have customarily refused to order prosecution. . .").

Not only is the Judicial Branch ill-suited to review prosecutorial decisions—given the complex factors involved—but judicial intervention would also undermine the Executive Branch's ability to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. As the Supreme Court elaborated:

> Judicial supervision in this area, moreover, entails
> systemic costs of particular concern. Examining the
> basis of a prosecution delays the criminal proceeding,
> threatens to chill law enforcement by subjecting the
> prosecutor's motives and decision-making to outside
> inquiry, and may undermine prosecutorial effectiveness
> by revealing the Government's enforcement policy. All

these are substantial concerns that make the courts
properly hesitant to examine the decision whether to
prosecute.

*Wayte*, 470 U.S. at 607-08.

Furthermore, "a district judge must be careful not to exceed

his or her constitutional role." *United States v. Microsoft*

*Corp*., 56 F.3d 1448, 1462 (D.C. Cir. 1995). The judiciary is

separated from the prosecutorial function, "keep[ing] the courts

as neutral arbiters in the criminal law generally." *Nader*, 497

F.2d at 679 n.18. "When a judge assumes the power to prosecute,

the number [of branches] shrinks to two." *In re United States*,

345 F.3d 450, 454 (7th Cir. 2003); *see also United States v.*

*Cox*, 342 F.2d 167, 171 (5th Cir. 1965) ("It follows, as an

incident of the constitutional separation of powers, that the

courts are not to interfere with the free exercise of the

discretionary powers of the attorneys of the United States in

their control over criminal prosecutions."). These institutional

concerns must shape any analysis of the Court's role in

reviewing the government's decision to offer a defendant a

deferred-prosecution agreement.

**C.   The Speedy Trial Act Subjects Deferred-Prosecution**
     **Agreements to Limited, But Meaningful, Court Review.**

Section 3161(h)(2) allows for the exclusion of "[a]ny period

of delay during which prosecution is deferred by the attorney

for the Government pursuant to written agreement with the

39

defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct." 28 U.S.C. 3161(h)(2). As Judge Gleeson held in *HSBC*, "a plain reading of this provision" contemplates court involvement in approving a deferred-prosecution agreement. *See HSBC*, 2013 WL 3306161, at *3. The government appears not to contest this point. *See* Gov't's Br. at 1. That said, however, the Act does not provide a standard for the court's review, nor is the term "approval" defined. *See HSBC*, 2013 WL 3306161, at *2.[7] Moreover, with the exception of the *HSBC* Opinion and Judge Leon's Opinion in *Fokker*, there is no case law on this issue.

---

[7] In *HSBC*, Judge Gleeson rejected the defendant's reliance on Section 3161(h)(7) of the Speedy Trial Act, which provides for an exclusion of time based on a determination "that the ends of justice served by [delay] outweigh the best interest of the public's and the defendant's interests in a speedy trial" and provides set of factors for a court to consider in conducting this inquiry. *HSBC*, 2013 WL 3306161, at *3. That provision, Judge Gleeson held, "is not a 'catch-all provision'; rather, it describes one specific type of exclusion—*i.e.*, when the ends of justice served by the exclusion outweigh the best interests of the public—permitted by the Speedy Trial Act." *Id.* Moreover, he found, "nowhere" does the Speedy Trial Act "suggest[] that this balancing inquiry applies to the myriad other types of exclusion enumerated in 28 U.S.C. § 3161(h)." *Id; but see United States v. Wright Med. Tech.*, No. 10-8233, 2010 WL 6606785, at *1 (D.N.J. Sept. 30, 2010) (importing, without analysis or explanation, the 3161(h)(7) factors in deciding to grant an exclusion of time under 3161(h)(2)). The Court agrees with Judge Gleeson. The 3161(h)(7) factors have not been used to inform court decisions regarding any other Speedy Trial Act exclusion and it would be anomalous to apply them to Section 3161(h)(2).

The text of the Act grants an exclusion when prosecution is deferred "pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct." 28 U.S.C. § 3161(h)(2). Although this language is not crystal clear, the requirement of court approval implies that the court must place its formal imprimatur on the agreement. This is significant, as the *amicus* notes, because "other provisions of the [Speedy Trial] Act do not require court approval, while still other provisions of the Act limit discretion, for example, by providing factors to be considered when deciding whether to grant a continuance, or by supplying standards for whether a type of delay is reasonable." Amicus Br., ECF No. 31 at 4.[8] The

---

[8] *See* 28 U.S.C. § 3161(h)(1) (excluding "[a]ny period of delay resulting from other proceedings concerning the defendant" and providing a representative list of such proceedings); *id.* § 3161(h)(3) (excluding "[a]ny period of delay resulting from the absence or unavailability of the defendant or an essential witness" and defining "absence"); *id.* § 3161(h)(4) (excluding "[a]ny period of delay resulting from the fact that the defendant is mentally incompetent or physically unable to stand trial"); *id.* § 3161(h)(5) (excluding, in cases where an information or indictment is dismissed by the government and charges are re-filed for the same offense, "any period of delay from the date the charge was dismissed to the date the time limitation would commence to run as to the subsequent charge had there been no previous charge"); *id.* § 3161(h)(6) (excluding "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted"); *id.* § 3161(h)(7) (excluding "[a]ny period of delay resulting from a continuance" provided that the judge finds "that the ends of justice served by taking such action outweigh the best interest

language does not grant the Court plenary power to review the agreement, however. The Court's approval authority is located within a sentence stating that the agreement must be "for the purpose of allowing the defendant to demonstrate his good conduct." 28 U.S.C. § 3161(h)(2). Arguably, then, court review must be tied to determining whether the agreement satisfies this purpose. Had Congress intended courts to review a deferred-prosecution agreement for other purposes, it presumably would have provided courts with guidance as to those purposes.

In the Court's opinion, the legislative history of Section 3161(h)(2) clearly shows that court involvement in the deferred-prosecution process was specifically intended. *See supra* Part II. This involvement was included to "assure[] that the court will be involved in the decision to divert and that the procedure will not be used by prosecutors and defense counsel to avoid the speedy trial time limits." S. Rep. No. 93-1021, at 37 (1974). One could seize on this final sentence of the Senate Judiciary Committee's Report to construct an argument in favor

---

of the public and the defendant in a speedy trial" and reciting factors for the court to consider in making this determination); *id.* § 3161(h)(8) (excluding "[a]ny period of delay, not to exceed one year, ordered by a district court upon an application of a party and a finding by a preponderance of the evidence that an official request . . . has been made for evidence of any such offense and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country").

of greater court authority. However, stating that the court "will be involved in the decision to divert" should not be interpreted to mean that the court will *make* the decision *whether* to divert.

The *amicus* argues in favor of a broad reading of the Speedy Trial Act, based on the Act's delegation of authority to the Court to "approve," and the absence of factors that are provided in other Speedy Trial Act exclusions. *See* Amicus Br. at 3-5. In light of the novelty of corporate deferred-prosecution agreements, *amicus* argues, the Court should fashion its own standards for approving or rejecting an agreement on a case-by-case basis, looking to standards provided for court oversight of other types of agreements. *See id.* at 5-7. The government would limit the Court's authority to deciding whether an agreement is merely an attempt to put off a pending trial. *See* Gov't's Br., ECF No. 26 at 6-7.

Faced with arguably ambiguous text that most clearly reads as tying the Court's authority to approve the agreement to determining whether it is truly designed to hold prosecution in abeyance while a defendant demonstrates good conduct, and arguably ambiguous legislative history that most clearly reads as intending that same result, the Court concludes that its authority under the Speedy Trial Act is limited to assessing

whether the agreement is truly about diversion.[9] This limited interpretation is especially appropriate where a broader one could effectively seize authority by the Judicial Branch over a traditional Executive Branch function. *See supra* Part III.B.

Accordingly, the Court finds that approval of a deferred-prosecution agreement should be granted under the Speedy Trial Act when the agreement is intended to hold prosecution in abeyance while a defendant demonstrates good conduct. *See HSBC*, 2013 WL 3306161, at *3 (the text and legislative history of the Speedy Trial Act make clear that the Court's involvement in deferred-prosecution agreements "is grounded in a concern . . . that parties will collude to circumvent the speedy trial clock," meaning that courts must "consider whether a deferred-prosecution agreement is truly about diversion and not simply a vehicle for fending off a looming trial date"); *cf. United States v. Credit Suisse AG*, No. 9-352, 2009 WL 4894467, at *1 (D.D.C. Dec. 16, 2009) (brief order stating that "following a careful review" of a deferred-prosecution agreement, the Court

---

[9] This ambiguity, combined with the fact that Congress's original purpose had nothing to do with the broad-ranging corporate deferred-prosecution agreements that have become commonplace, suggests that congressional action to clarify the standards a court should apply when confronted with a corporate deferred-prosecution agreement may be appropriate. As the *amicus* has written, corporate deferred-prosecution agreements often result in large structural reforms that may have far-reaching consequences. *See* Brandon L. Garrett, *Structural Reform Prosecution*, 93 Va. L. Rev. 853 (2007).

concluded "that the period of delay . . . is for the purpose of
allowing Defendant . . . to demonstrate its good conduct and
implement its remedial measures").

This authority necessarily involves *limited* review of the
fairness and adequacy of an agreement, to the extent necessary
to determine the agreement's purpose. In this respect, the Court
finds that its authority is greater than the largely
administrative authority contemplated by the government. The
Court must determine whether an agreement is truly about
permitting a defendant to demonstrate reform. In so doing, the
factors the *amicus* provided could be useful guideposts. *See*
Amicus Br. at 11–17 (suggesting that courts look at nine factors
in reviewing deferred-prosecution agreements: (1) reasonableness
of any fines or other punitive measures; (2) compliance-related
safeguards; (3) independent corporate monitors to supervise
compliance; (4) cooperation with authorities in ongoing
investigations; (5) the lack of unrelated requirements that
might require judicial intervention; (6) potential collateral
consequences of the agreement; (7) the appropriateness of
restitution to any victims; (8) the effect of the agreement on
other regulators; and (9) the effect of the period of delay on
statutes of limitations or other interests). An agreement that
contained neither punitive measures (such as fines) nor
requirements designed to deter future criminality (such as

compliance programs and independent monitors) could not be said
to be designed to secure a defendant's reformation and should be
rejected. Even an agreement that contained some of these
elements could be ineffective if the obligations were found to
be so vague or minimal as to render them a sham. *Cf. Fokker
Servs.,* 79 F.Supp.3d at 166 (finding fines and compliance
measures to be weak and noting the complete lack of an
independent monitor or requirement that the defendant submit
compliance reports in denying approval of a deferred-prosecution
agreement). Accordingly, the Court is persuaded that it retains
authority under the Speedy Trial Act, albeit limited, to
consider the terms of a deferred-prosecution agreement to
determine whether they provide the defendant an opportunity to
demonstrate good conduct while prosecution is deferred.

> **D.   The Court's Supervisory Power Permits the Court to Deny
>       Approval Where a Deferred-Prosecution Agreement Would
>       Involve the Court in Illegal or Especially Problematic
>       Agreements.**

"The supervisory power . . . permits federal courts to
supervise 'the administration of criminal justice' among the
parties before the bar." *United States v. Payner*, 447 U.S. 727,
735 n.7 (1980) (quoting *McNabb v. United States*, 318 U.S. 332,
340 (1943)). "Judicial supervision of the administration of
criminal justice in the federal courts implies the duty of
establishing and maintaining civilized standards of procedure

and evidence. . . [which are] not satisfied merely by observance
of those minimal historic safeguards for securing trial by
reason which are summarized as 'due process of law.'" *McNabb*,
318 U.S. at 340.

The courts have exercised this authority at times
"substantively, that is, to provide a remedy for the violation
of a recognized right of a criminal defendant." *HSBC*, 2013 WL
3306161, at *4. Thus, the supervisory power may be used "to
exclude evidence taken from the defendant by 'willful
disobedience of law.'" *Payner*, 447 U.S. at 735 n.7 (quoting
*McNabb*, 318 U.S. at 345). It may relatedly be used "to correct
an error which permeated [a judicial] proceeding." *Ballard v.
United States*, 329 U.S. 187, 193 (1946) (grand and petit juries
were drawn, in violation of applicable state law, from a pool
that excluded women).

The power has also been used to "formulate[] rules of evidence
to be applied in federal criminal prosecutions." *McNabb*, 318
U.S. at 341. As the Supreme Court explained more recently, "[i]n
the exercise of its supervisory authority, a federal court 'may,
within limits, formulate procedural rules not specifically
required by the Constitution or the Congress.'" *Bank of Nova
Scotia v. United States*, 487 U.S. 250, 254 (1988) (quoting
*United States v. Hasting*, 461 U.S. 499, 505 (1983)). This
Circuit has exercised its supervisory power to mandate the use

of a particular jury-deadlock instruction, *United States v. Thomas*, 449 F.2d 1177, 1187 (D.C. Cir. 1971). The U.S. District Court for the District of Columbia used the power to establish standards governing the sealing and unsealing of court records. *See United States v. Ring*, No. 8-274, 2014 WL 2584054, at *2 (D.D.C. June 10, 2014) (citing *United States v. Hubbard*, 650 F.2d 293, 315-18 (D.C. Cir. 1980)). Moreover, "courts have historically exercised their supervisory power to develop appropriate exceptions to the rule of grand jury secrecy." *In re Kutler*, 800 F. Supp. 2d 42, 46 (D.D.C. 2011).

Of utmost importance, the supervisory power serves "to protect the integrity of the federal courts." *Payner*, 447 U.S. at 744 (Marshall, J., dissenting) (citing *McNabb*, 318 U.S. at 342, 345, 347; *see also id.* ("The Court has particularly stressed the need to use supervisory powers to prevent the federal courts from becoming accomplices to . . . misconduct"); *Mesarosh v. United States*, 352 U.S. 1, 14 (1956) ("This is a federal criminal case, and this Court has supervisory jurisdiction over the proceedings . . . . If it has any duty to perform in this regard, it is to see that the waters of justice are not polluted."). As Justice Holmes stated in *Olmstead v. United States*, "no distinction can be taken between the government as prosecutor and the government as judge. If the existing code does not permit district attorneys to have a hand in such dirty

business it does not permit the judge to allow such iniquities to succeed." 277 U.S. 438, 470 (1928) (Holmes, J., dissenting); *see also id.* at 483 (Brandeis, J., dissenting) ("When the government, having full knowledge, sought, through the Department of Justice, to avail itself of the fruits of these acts in order to accomplish its own ends, it assumed moral responsibility for the officers' crimes. . . . [A]nd if this court should permit the government, by means of its officers' crimes, to effect its purpose of punishing the defendants, there would seem to be present all the elements of a ratification. If so, the government itself would become a lawbreaker."). "One of the primary purposes of the supervisory power is to protect the integrity of judicial proceedings." *HSBC*, 2013 WL 3306161, at *4 (citing *Hasting*, 461 U.S. at 526; *Payner*, 447 U.S. at 735 n.8; *Elkins v. United States*, 364 U.S. 206,216 (1960)).

The supervisory power is a limited power, however. It "is an extraordinary one which should be 'sparingly exercised.'" *United States v. Jones*, 433 F.2d 1176, 1181–82 (D.C. Cir. 1970) (quoting *Lopez v. United States*, 373 U.S. 427, 440 (1963)). This is so because it arguably functions as "a form of specialized and limited federal common law." *United States v. Gatto*, 763 F.2d 1040, 1045 (9th Cir. 1985); *see also United States v. Strothers*, 77 F.3d 1389, 1397 (D.C. Cir. 1996) (Sentelle, J., concurring) ("[W]hatever its historical underpinnings, the

exercise of the supervisory power denotes a distinctive form of judicial lawmaking by the federal courts." (citation omitted)). The authority is thus limited by the doctrine of separation of powers. Even if exercised in a "sensible and efficient" fashion, it "is invalid if it conflicts with constitutional or statutory provisions." *Bank of Nova Scotia*, 487 U.S. at 254 (citation omitted); *see also Payner*, 447 U.S. at 737 (Burger, C.J., concurring) ("this Court has no general supervisory authority over operations of the Executive Branch, as it has with respect to the federal courts"); *Gatto*, 763 F.2d at 1046 ("Proper regard for judicial integrity does not justify a 'chancellor's foot veto' over activities of coequal branches of government") (quoting *United States v. Russell*, 411 U.S. 423, 435 (1973)). Use of the supervisory power must therefore be balanced against concerns of competing branches of the federal government.

In the context of prosecutorial decisions, "the federal judiciary's supervisory powers over prosecutorial activities that take place outside the courthouse is extremely limited, if it exists at all." *United States v. Lau Tung Lam*, 714 F.2d 209, 210 (2d Cir. 1983). As previously discussed,

> [T]he decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the government's enforcement priorities, and the case's relationship to the government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

*Wayte*, 470 U.S. at 607. In this vein, the Court would have little authority, if any, to review an out-of-court non-prosecution agreement between the government and a defendant. *See* Amicus Br., ECF No. 31 at 6. Similarly, the government may offer an individual immunity from prosecution and courts have no discretion to review the appropriateness of the Executive Branch's decision. *See Ullmann v. United States*, 350 U.S. 422, 432-33 (1956); *United States v. Moore*, 651 F.3d 30, 82 (D.C. Cir. 2011) (holding that district courts have "no authority to immunize . . . or to compel the government to immunize"; "[t]he decision to grant immunity from prosecution rests solely with the Executive Branch").

Nonetheless, the Court is not presented with an outright grant of immunity, a decision not to prosecute, or a non-prosecution agreement. The parties have brought criminal cases, consented to the waiver of an indictment, and presented the Court with deferred-prosecution agreements *for the Court's approval*. Whether the parties label that approval as the approval only of a Speedy Trial Act exclusion, or approval of the agreements themselves is of little consequence. The Court is being asked to place its formal imprimatur on the agreements, to hold open two federal criminal cases, and to make various

findings with respect to the Speedy Trial Act. As Judge Gleeson found in *HSBC*:

> [F]or whatever reason or reasons, the contracting parties have chosen to implicate the Court in their resolution of this matter. There is nothing wrong with that, but a pending federal criminal case is not window dressing. Nor is the Court, to borrow a famous phrase, a potted plant. By placing a criminal matter on the docket of a federal court, the parties have subjected their DPA to the legitimate exercise of that court's authority.

*HSBC*, 2013 WL 3306161, at *5. This implicates the aspect of the supervisory power that is "concerned with law enforcement practices . . . in so far as courts themselves become instruments of law enforcement." *McNabb*, 318 U.S. at 347.

The question remains what standard the Court should apply in deciding whether a request for approval of a deferred-prosecution agreement and placement of that agreement on the Court's docket must be rejected "to protect the integrity of the federal courts." *Payner*, 447 U.S. at 744 (Marshall, J., dissenting). As the *amicus* notes "[a] court would be particularly deferential in reviewing the decision whether to offer pre-trial diversion." Amicus Br. at 10. That decision, like the decision whether to prosecute, is largely within the discretion of the Executive, and the Court may review it only in very limited circumstances. *See United States v. Richardson*, 856 F.2d 644, 647 (4th Cir. 1988) (the decision whether to offer pre-trial diversion "is one entrusted to the United States

Attorney"); *United States v. Hicks*, 693 F.2d 32, 34 n.1 (5th
Cir. 1982) ("Since pretrial diversion is a program administered
by the Justice Department, considerations of separation of
powers and prosecutorial discretion might mandate an even more
limited standard of review.").

With respect to the contents of the agreements, the Court is
of the view that the *amicus*'s proposal of largely plenary court
review, discussed above in connection with the Speedy Trial Act,
is too broad. The power to protect the integrity of the
judiciary keeps courts from becoming accomplices in illegal or
untoward actions, but the Court's review is necessarily limited.
Here, in particular, Congress, in passing the Speedy Trial Act,
has arguably prescribed a narrower role for courts in reviewing
these very sensitive and important decisions. *See supra* Part
III.C. Respect for the separation of powers thus counsels in
favor of Judge Gleeson's view of the role the supervisory power
plays:

> [I]t is easy to imagine circumstances in which a deferred
> prosecution agreement, or the implementation of such an
> agreement, so transgresses the bounds of lawfulness or
> propriety as to warrant judicial intervention to protect
> the integrity of the Court. For example, the DPA, like
> all such agreements, requires HSBC to "continue to
> cooperate fully with the [government] in any and all
> investigations." Recent history is replete with
> instances where the requirements of such cooperation
> have been alleged and/or held to violate a company's
> attorney-client privilege and work product protections,
> or its employees' Fifth or Sixth Amendment rights. The
> DPA also contemplates, in the event of a breach by HSBC,

> an explanation and remedial action, which the government will consider in determining whether to prosecute the pending charges and/or bring new ones. What if, for example, the "remediation" is an offer to fund an endowed chair at the United States Attorney's *alma mater?* Or consider a situation where the current monitor needs to be replaced. What if the replacement's only qualification for the position is that he or she is an intimate acquaintance of the prosecutor proposing the appointment?

*HSBC*, 2013 WL 3306161, at *6–7 (citations omitted). This is far from an exhaustive list, but it demonstrates the situations where a court's integrity might truly be imperiled. Two of the factors proposed by the *amicus* are useful here: (1) whether the agreement "impos[es] substantial, unrelated obligations on an organization . . . such as requiring charitable contribution unrelated to remedying the harm caused by the crime"; and (2) the potential collateral consequences of an agreement. *See* Amicus Br. at 14–15. An agreement with especially problematic collateral consequences—whether intended or not—might be viewed as involving the Court in something inappropriate. In that regard, the Court can envision an especially unfair or lenient agreement as transgressing these bounds and therefore justifying rejection, independent of a court's review under the Speedy Trial Act.

**IV.  Applying these Standards to the Agreements in the Case, the Court Approves Both Agreements.**

The Court need not opine further on the precise circumstances in which the Court's authority under the Speedy Trial Act or the supervisory power would warrant rejection of an agreement. The agreements in these cases, although somewhat troubling to the Court in the Saena Tech case, do not implicate the integrity of the Court. For that reason, the Court will approve both agreements and grant the requested exclusion of time under the Speedy Trial Act.

**A.  *United States v. Saena Tech.***

The Saena Tech Agreement clearly is about diversion with respect to Saena Tech itself. Saena Tech has paid a $500,000 fine that, while not clearly shown to be proportional to the offense,[10] is not *de minimis*. Moreover, the Saena Tech Agreement provides that prosecution will be reinstated in the event that Saena Tech breaches the agreement. *See* Deferred-Prosecution Agreement, ECF No. 5-1 at 9. The Saena Tech Agreement also provides for the creation of a corporate-compliance program to ensure that Saena Tech does not commit bribery in the future.

---

[10] The Agreement provides, without support or explanation, that $500,000 is "appropriate given the facts and circumstances of this case." Deferred-Prosecution Agreement, ECF No. 5-1 at 5. Given that Mr. Kim paid approximately $280,000 in bribes and received fifteen subcontracts for Saena Tech, it is certainly conceivable that he and the corporation earned far more than $500,000.

*See id.* at 7. In response to this provision, Saena Tech has

created a Code of Conduct and guide for its employees addressing

ethical issues including those related to gifts and bribery,

created a confidential hotline for employees to report

misconduct, and appointed its outside counsel to monitor the

hotline and serve as an independent auditor. *See* Proffer, ECF

No. 16. The Saena Tech Agreement thus contains both punitive and

rehabilitative elements sufficient to convince the Court that it

is designed to defer prosecution for two years to enable Saena

Tech to reform itself and demonstrate its rehabilitation.

Although no independent compliance monitor with reporting

responsibilities is included in the Saena Tech Agreement, and

the Court shares Judge Leon's concerns with deferred-prosecution

agreements that lack such monitoring, *see Fokker Servs.,* 79

F.Supp.3d at 166, given the relatively small size of Saena Tech,

its appointment of its outside counsel to serve as a monitor,

and the Court's exercise of authority to require reports and

status hearings, the Court finds that the lack of an independent

compliance monitor in this case does not doom the Saena Tech

Agreement.[11]

---

[11] Initially, Saena Tech had used an individual who was related
to Mr. Kim as its compliance monitor. Because that practice
changed before the Court's September 5, 2014 hearing, *see*
Proffer, ECF No. 16, the Court need not address whether such a
concerning practice would alone be enough to justify rejection

The Saena Tech Agreement is novel, however, because it also includes Mr. Kim, who is not currently subject to prosecution at all. Although the parties do not seek approval of a Speedy Trial exclusion as to him (there is no pending case and thus no clock to toll), and the government argues that any grant of immunity is unreviewable by this Court, Gov't's Br., ECF No. 26 at 10-11, nonetheless, the government decided to include Mr. Kim in a deferred-prosecution agreement that the Court must review before approving an exclusion for Saena Tech.[12] Just as the parties may not collude to enter into a deferred-prosecution agreement with each other for reasons other than allowing the defendant to demonstrate good conduct, so too may they not enlist a third party—in this case a company controlled by Mr. Kim and his wife—to effect the same result.

Thus, if the punitive and remedial measures regarding Saena Tech were mere "window-dressing" to cover an attempt to collude between Mr. Kim and the government, the Court would be empowered to reject the Saena Tech Agreement under the Speedy Trial Act. Although it could be readily criticized for its favorable

---

of the Saena Tech Agreement or a finding of non-compliance with that Agreement.

[12] As discussed *supra*, the government conceded that in the Saena Tech Agreement, Mr. Kim is essentially being immunized, but noted that the immunity is contingent upon his cooperation. The government also articulated its rationale for not charging Mr. Kim.

treatment of Mr. Kim vis-à-vis others who arguably played lesser
roles in related criminal activity but received felony
convictions, in view of the prior discussion about the
application of deferred-prosecution agreements for individuals
in appropriate cases, it is not so problematic as to implicate
the Court's authority here. Though Mr. Kim faces no punitive
measures personally, he and his wife are the sole owners of
Saena Tech; thus the agreement's punitive force against Saena
Tech touches him as well. Moreover, Mr. Kim may be prosecuted in
the event of a breach, and he admitted to the truth of the
Statement of Facts at the July 17, 2014 hearing. *See* Deferred-
Prosecution Agreement, ECF No. 5-1 at 9; Tr. of July 17, 2014
Hearing, ECF No. 38 at 66:14–67:4. Mr. Kim remains free to
operate Saena Tech along with his wife, but he must institute
and follow the compliance program required of the company. It is
therefore not apparent that the Saena Tech Agreement is an
elaborate attempt to collude to put off a trial of Mr. Kim.
Indeed, no Speedy Trial clock is ticking and the government
presumably could have obtained his agreement to waive the
statute of limitations out-of-court, making collusion
unnecessary. Accordingly, despite the odd posture, the
provisions regarding Mr. Kim do not change the outcome under the
Speedy Trial Act.

Nor does the Court's supervisory power justify denial of the
Saena Tech Agreement because nothing in the Saena Tech Agreement
strikes the Court as implicating the concern with avoiding court
involvement in unlawful or untoward collusion. The authority to
make charging decisions is entrusted to prosecutors for a
reason: their expertise and the separation of powers mandates
it. Absent a stark deviation from reasonable exercise of that
discretion, it is not this Court's role to second-guess such
decisions.[13]

B.   *United States v. Intelligent Decisions*.

The Intelligent Decisions Agreement is a relatively easy one
to approve. Much like the Saena Tech Agreement, it contains most
of the hallmarks of an agreement that is designed to reform a
company's conduct. *See* Deferred-Prosecution Agreement, ECF No.
12. Intelligent Decisions paid a fine that appears to be within
a range of reasonableness, and agreed to cooperate and institute
compliance measures. For reasons similar to the Saena Tech
Agreement, the Court finds that the lack of an independent
compliance monitor with reporting responsibilities alone is not
sufficient to warrant rejection of the Intelligent Decisions

---

[13] Congress, of course, has the ability to dictate a more
involved role for district courts that would extend to such
searching review of deferred-prosecution agreements. The Court
expresses no opinion on the propriety of such an action or any
separation-of-powers concerns that may arise therefrom.

Agreement. The Intelligent Decisions Agreement deviates from the Saena Tech Agreement in that it contains nothing that would immunize an individual responsible for the crime with which Intelligent Decisions is charged. Indeed, the owner and former CEO of Intelligent Decisions pleaded guilty to a felony, as did a key employee who was also involved in the conduct. There is thus nothing to indicate that the Intelligent Decisions Agreement is anything but an attempt to reform the company and allow it to demonstrate good conduct. Nor is there anything in the Intelligent Decisions Agreement that would appear to implicate the Court's supervisory powers.

## V.   Original Intent vs. Current Use of Deferred-Prosecution Agreements.

Although the Court approves the two deferred-prosecution agreements in these cases, the Court observes that the current use of deferred-prosecution agreements for corporations rather than individual defendants strays from Congress's intent when it created an exclusion from the speedy trial calculation for the use of such agreements. The Court is of the opinion that increasing the use of deferred-prosecution agreements and other similar tools for individuals charged with certain non-violent criminal offenses could be a viable means to achieve reforms in our criminal justice system.

**A.   Congress Modeled the Provision Allowing Deferred-Prosecution Agreements on Projects Designed to Rehabilitate Individuals Charged with Certain Non-Violent Offenses.**

The legislative history of the Speedy Trial Act, discussed *supra* Part II, shows just how far the use of Section 3161(h)(2) to defer the prosecution of corporations departs from what Congress intended. The history demonstrates that the provision was intended to encourage practices that had been ongoing in certain courts, which permitted the deferral of prosecution on the condition that a defendant participate in a rehabilitation program. The Senate Judiciary Committee specifically cited a successful project in New York City, the Manhattan Court Employment Project, as well as the District of Columbia's Project Crossroads as examples of the types of deferred prosecution it intended with this provision.

   1.   *The Manhattan Court Employment Project.*

The Manhattan Court Employment Project ("the Project") was designed as an experimental, alternative disposition available for select, eligible defendants. It was developed in 1967 by the Vera Institute of Justice, was sponsored by the Mayor of New York City, and received funding from the United States Department of Labor. *See* Vera Inst. of Justice, The Manhattan Court Employment Project of the Vera Institute for Justice: Final Report 1967-1970 at 1 (1970), *available at*

http://www.vera.org/sites/default/files/resources/downloads/the-manhattan-court-employment-project.pdf. After the three-year "experimental phase", the Project published a Final Report summarizing its process, progress, and findings. *Id.* at 2.[14]

The Project would intervene after a defendant's arrest, offering counseling and vocational opportunities for ninety days. If the defendant cooperated, the Project would recommend that the prosecutor (and judge) dismiss the charge(s). *Id.* The Project was designed to "convert a defendant's arrest from a losing to a winning experience" by freeing the overburdened criminal justice system, reducing recidivism, employing defendants, and benefitting the community by rehabilitating defendants. *Id.*

The Project established eligibility standards for potential participants to identify defendants most likely to benefit from the program. The criteria included individuals: (1) between the ages of 16 and 45; (2) who were residents of New York City; (3) not earning more than $125/week; (4) not charged with a petty offense, homicide, rape, kidnapping, or arson; (5) with no identifiable drug or alcohol addiction; and (6) who have not spent more than one continuous year in a penal institution. *Id.*

---

[14] The Court was unable to determine how long the Project continued. The Report indicates the Project was expanding at the time of publishing and that "the Mayor and other city and court officials continue to support the Project." *Id.* at 61.

at 3. The Project initially eliminated defendants arrested for engaging in the drug trade or prostitution, *id.* at 21, but over time, became more capable of assisting defendants with drug or alcohol problems and defendants charged with more serious crimes. *See id.* at 22.

The District Attorney's office and Project administrators would request that the court and prosecutors permit a defendant to participate. Once participation was approved, the case would be put on hold for ninety days. *Id.* at 3. Depending on participant success, the Project would recommend dismissal, further adjournment to permit additional counseling, or termination of the defendant's participation and the resumption of the case. *Id.* at 3-4. To remain in the Project and receive a dismissal recommendation, a participant was required to: (1) avoid re-arrest and narcotics use; (2) keep all appointments with Project staff; (3) attend all counseling sessions; and (4) make a satisfactory vocational adjustment. *Id.* at 4.

Over three years, 1,300 defendants participated in the Project, *id.* at 5, and the number of successful participants – those for whom dismissals were recommended and accepted – increased over the Project's three years from 38.9% in the first year to 45.6% in the second year, and 61.4% in the third year. *Id.* at 39. The Report also assessed the Project's success in

placing defendants in employment, providing counseling and social services, and preventing recidivism.

Employment. While not every participant was unemployed upon entry into the Project, most were. *Id.* at 7. The Project was successful in placing defendants in employment. In the first year, 14.3% of participants were employed at intake and 91.4% were employed at dismissal. *Id.* In the second year, 43.1% of defendants were employed at intake and 95.4% were employed at dismissal. *Id.* In the third year, 30.6% of participants were employed at intake and 79.3% were employed at dismissal. *Id.* The Project attributed the drop in the third year to a change in the minimum-wage law in July 1970 and an increase in the number of students participating in the Project that year. *Id.* at 8. Further, the Project checked the employment status of a random sample of 100 successful participants who had been dismissed from the Project for 14 months. The Project was able to locate 87 participants; 70 were still employed 14 months later. *Id.* Considering that the Project had certified its participants as previously having been "hard-core" unemployed, these results were encouraging. *Id.* at 27.

Counseling and Social Services. The Project provided both group and individualized counseling for participants. Though it was difficult for the Project to quantify success on this front, the rate of participation in group counseling increased from 45%

to 67% over the Project's three years. *Id.* at 10. The Project
also had a Social Service Unit, which worked with New York
City's Department of Social Services to respond to participants'
financial, medical, and housing needs. *Id.* Participants' need
for welfare decreased, in part due to increased employment. *Id.*
at 11.

Recidivism. Finally, the Project compared recidivism rates for
successful participants whose charges were dismissed and rates
for participants who were unsuccessfully terminated from the
Project. *Id.* at 12. During the first two years, the re-arrest
rate for the dismissed group was about 50% less than that of the
terminated group: 15.8% of successful participants were re-
arrested compared to 30.8% of terminated participants. *Id.* at
12. In the last nine months of the three year experimental
phase, the re-arrest rate dropped to 2.9%. *Id.* at 10.
Significantly, the Project found that the recidivism rates for
terminated participants, whose prosecution was ultimately only
diverted for a few months, and the control group, were
statistically identical. *Id.* The data "strongly suggests that
diversion from prosecution alone does not affect the likelihood
of re-arrest" and that "supportive and rehabilitative services
*can* significantly alter the incidence of repeated criminal
activity." *Id.*

2.    *Project Crossroads.*

Project Crossroads was created in 1967 to provide a pre-trial intervention alternative for youthful, first-time defendants in Washington, D.C. It provided services to approximately 800 participants for a limited period of time.[15] Roberta Rovner-Pieczenik, Nat'l Comm. for Children and Youth, Project Crossroads as Pre-Trial Intervention: a Program Evaluation 1 (1970), *available at* http://files.eric.ed.gov/fulltext/ ED113651.pdf. The Project received funding from the United States Department of Labor. *Id.* at 2. Like the Manhattan Court Employment Project, Project Crossroads intervened after arrest, offering a variety of services for defendants including counseling, job placement, job training and remedial education. *Id.* at 1. If a defendant cooperated and participated successfully for ninety days, the Project would recommend that the charges be dismissed. *Id.* at 2. According to the program evaluation, "[i]t was the hope of all concerned that the court, in its willingness to aid the individual by providing him with a non-punitive opportunity for rehabilitation, would come to be

---

[15] The program evaluation was written three years after Project Crossroads began. *See id.* at 1. The Court was unable to determine how long the project continued after the evaluation was published.

viewed as an institution interested in the individual and oriented toward the treatment approach to crime prevention." *Id.*

Project Crossroads set general eligibility standards for potential participants, including individuals: (1) between the ages of 16 and 26; (2) with no prior conviction record in that court; (3) who were unemployed, underemployed, tenuously employed, or school enrolled; and (4) who were charged with a crime accepted by both the court and Project. *Id.* at 1. Ultimately, participants who were terminated favorably had their charges dismissed three times as often as a control sample. *Id.* at 15.

Employment. The evaluation of Project Crossroads found that twice as many individuals were employed at program termination than were employed at intake. *Id.* at 14. It found that participants' wages and skill level increased after termination when compared to the same measures taken at entrance. *Id.* It also found that participants were more likely to be steadily employed during the year following project termination. *Id.* The evaluation followed up with a sample of 134 participants one year after termination. About 60% of those favorably terminated were employed for more than 80% of the year following termination, while only about 23% of those unfavorably terminated were employed over the same period. *Id.* at 12. Further, favorably terminated participants were almost all

working in a non-Crossroads job within four months after
termination. *Id.* at 13. Thus, the Project concluded "that the
routine of work, as well as such intangibles as self-confidence
and increased aspiration derived from the Crossroads experience,
tend to keep an individual employed after the official
relationship with Crossroads is ended." *Id.*

Recidivism. The evaluation also found the rate of recidivism
to be the "most dramatic positive finding related to the
project's legal success. . ." *Id.* at 17. "[T]here is little
doubt that recidivism in . . . [the] 15-month period following
initial arrest was markedly lower for participants favorably
terminated." *Id.* at 17-18. The overall recidivism rate within
fifteen months of initial arrest for those favorably terminated
was 20.13% compared to 56.65% for those unfavorably terminated
and 43.36% for the control group. *Id.* at 17.

**B. Current Use of Deferred-Prosecution Agreements.**

Notwithstanding Congress's intent in enacting Section
3161(h)(2) of the Speedy Trial Act, rather than offering
deferrals to individuals charged with certain non-violent
criminal offenses to encourage rehabilitation, the government
increasingly now offers—as it did to the defendants in these
cases—to defer prosecution of a corporation for criminal
misconduct in exchange for the payment of a fine and the
institution of compliance measures. *See, e.g.,* Gibson Dunn, 2015

Mid-Year Update on Corporate Non-Prosecution Agreements and
Deferred Prosecution Agreements 1, (July 8, 2015), *available at*
http://www.gibsondunn.com/publications/Pages/2015-Mid-Year-
Update-Corporate-Non-Prosecution-Agreements-and-Deferred-
Prosecution-Agreements.aspx. From 2000 through 2005, the average
number of deferred-prosecution agreements was just over four per
year. *See id.* In contrast, from 2005 through 2015, the number of
deferred-prosecution agreements increased dramatically, and the
number of agreements with corporations may exceed historical
highs in 2015. *See id.* Often, but not always, as the Intelligent
Decisions case demonstrates, the corporation is the only entity
ever charged and the individuals responsible face no charges.
*See* Defs.' Br., ECF No. 8 at 2-3 ("two [Intelligent Decisions]
employees, Chae Shim and Harry Martin, have pled guilty to one
count of providing travel and entertainment gratuities to Mr.
Lim, for which they are awaiting sentencing."); *see also* Gibson
Dunn, 2010 Year-End Update at 1 (discussing the increased
criticism and heightened judicial scrutiny surrounding the use
of deferred-prosecution agreements without related prosecutions
of any individuals whose conduct resulted in corporate
liability).

In response to criticism surrounding the practice of failing
to prosecute the individuals whose actions are actually the
cause of corporate crimes, the Department of Justice recently

issued guidance designed to strengthen its ability to hold individuals accountable for corporate wrongdoing in future investigations and pending investigations "to the extent it is practicable to do so."  *See* Memorandum from Sally Quillian Yates, Deputy Attorney General, to Assistant Attorneys Gen., Dirs. Of the Fed. Bureau of Investigation and the Exec. Office for U.S. Trs., and U.S. Attorneys at 2-3 (Sept. 9, 2015), *available at* http://www.justice.gov/dag/file/769036/download. The memo sets forth six key steps to achieve this goal:

(1)   In order to qualify for any cooperation credit, corporations must provide to the Department all relevant facts relating to the individuals responsible for misconduct;

(2)   Criminal and civil corporate investigations should focus on individuals from the inception of the investigation;

(3)   Criminal and civil attorneys handling corporate investigations should be in routine communication with one another;

(4)   Absent extraordinary circumstances or approved departmental policy, the Department will not release culpable individuals from civil or criminal liability when resolving a matter with a corporation;

(5)   Department attorneys should not resolve matters with a corporation without a clear plan to resolve related individual cases, and should memorialize any declinations as to individuals in such cases; and

(6)   Civil attorneys should consistently focus on individuals as well as the company and evaluate whether to bring suit against an individual based on considerations beyond that individual's ability to pay.

*Id.* at 2-3. The memo states that some of these steps reflect policy shifts, but does not identify those which change current policy. *Id.* at 2.

Just a week after announcing this policy shift, however, and in a shocking example of potentially culpable individuals not being criminally charged, the Department of Justice announced that it had entered into a Deferred-Prosecution Agreement with General Motors Company ("GM") regarding its failure to disclose a safety defect. Under this agreement, GM admitted that it failed to disclose a "potentially lethal safety defect" and that it "affirmatively mislead consumers about the safety of GM cars afflicted by the defect," resulting in numerous deaths. General Motors Company – Deferred Prosecution Agreement, 15-cv-7342 (N.Y.S.D.), ECF No. 1-1 at 3, 34-36 (describing fatalities associated with the safety defect). Despite the fact that the reprehensible conduct of its employees resulted in the deaths of many people, the agreement merely "imposes on GM an independent monitor to review and assess policies, practices, and procedures relating to GM's safety-related public statements, sharing of engineering data, and recall processes" plus the payment of a $900 million fine. Press Release, Dep't of Justice, Manhattan U.S. Attorney Announces Criminal Charges Against General Motors and Deferred Prosecution Agreement with $900 Million Forfeiture (Sept. 17, 2015), *available at* http://www.justice.gov/usao-

sdny/pr/manhattan-us-attorney-announces-criminal-charges-against-general-motors-and-deferred. If GM abides by the terms of the agreement for three years, the government will defer prosecution and then seek to dismiss the charges. *Id.*

Despite this evolution in the use of deferred-prosecution agreements, the Court does not find that approving such agreements with corporations to be legally improper: Congress provided the deferred-prosecution tool without limiting its use to individual defendants or to particular crimes. Notwithstanding clear congressional intent, however, the Court is disappointed that deferred-prosecution agreements or other similar tools are not being used to provide the same opportunity to individual defendants to demonstrate their rehabilitation without triggering the devastating collateral consequences of a criminal conviction. Department of Justice statistics indicate that in fiscal year 2012, there were a total of 253 pretrial diversions for individual defendants, accounting for 0.9%[16] of the reasons why Assistant United States Attorneys declined to prosecute. *See* Mark Motivans, Statistician, Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, "Federal Justice Statistics, 2012 - Statistical Tables", tbl.

---

[16] Percent is based on suspects for whom a reason for declination could be determined. *See* Bureau of Justice Statistics, at tbl. 2.3 p. 12.

2.3 p. 12 (2015), *available at* http://www.bjs.gov/content/pub/
pdf/fjs12st.pdf. This is in contrast to the use of corporate
deferred-prosecution agreements and non-prosecution agreements
in the Department of Justice's Criminal Division, which the
Government Accountability Office found were comparable to the
number of corporate prosecutions undertaken between fiscal years
2004 and 2009. *See* U.S. Gov't Accountability Office, GAO 10-110,
DOJ Has Taken Steps to Better Track Its Use of Deferred and Non-
Prosecution Agreements, but Should Evaluate Effectiveness 1
(2009), *available at* http://www.gao.gov/assets/300/299781.pdf.
That said, in the U.S. Attorneys' Offices, the number of
deferred-prosecution and non-prosecution agreements was less
than the number of corporate prosecutions. *Id.* at 13.

As the use of deferred-prosecution agreements to benefit
corporate defendants has increased, public dialogue has begun to
focus on ways in which the criminal justice system can be
reformed to reduce over-incarceration of individuals for non-
violent crimes, especially drug crimes. President Barack H.
Obama recently acknowledged that "[m]ass incarceration makes our
country worse off, and we need to do something about it."
President Barack Obama, Remarks by the President at the NAACP
Conference (July 14, 2015), *available at* https://www.whitehouse
.gov/the-press-office/2015/07/14/remarks-president-naacp-

conference. The President went on:

> The United States is home to 5 percent of the world's
> population, but 25 percent of the world's prisoners.
> Think about that. Our incarceration rate is four times
> higher than China's. We keep more people behind bars
> than the top 35 European countries combined. And it
> hasn't always been the case -- this huge explosion in
> incarceration rates. In 1980, there were 500,000 people
> behind bars in America -- half a million people in
> 1980. . . . Today there are 2.2 million. It has
> quadrupled since 1980. Our prison population has
> doubled in the last two decades alone.
>
> *     *     *
>
> But here's the thing: Over the last few decades, we've
> also locked up more and more nonviolent drug offenders
> than ever before, for longer than ever before. And that
> is the real reason our prison population is so high. In
> far too many cases, the punishment simply does not fit
> the crime. If you're a low-level drug dealer, or you
> violate your parole, you owe some debt to society. You
> have to be held accountable and make amends. But you
> don't owe 20 years. You don't owe a life
> sentence. That's disproportionate to the price that
> should be paid.

*Id.* Along similar lines just last year, then-Attorney General

Eric H. Holder *celebrated* the first year-to-year drop in the

federal prison population in decades:

> [T]he United States will never be able to prosecute or
> incarcerate its way to becoming a safer nation. We must
> never, and we will never, stop being vigilant against
> crime—and the conditions and choices that breed it. But,
> for far too long—under well-intentioned policies
> designed to be "tough" on criminals—our system has
> perpetuated a destructive cycle of poverty, criminality,
> and incarceration that has trapped countless people and
> weakened entire communities—particularly communities of
> color.
>
> *     *     *

74

Perhaps most troubling is the fact that this astonishing rise in incarceration—and the escalating costs it has imposed on our country, in terms both economic and human—have not measurably benefitted our society. We can *all* be proud of the progress that's been made at reducing the crime rate over the past two decades—thanks to the tireless work of prosecutors and the bravery of law enforcement officials across America. But statistics have shown—and all of us have seen—that high incarceration rates and longer-than-necessary prison terms *have not* played a significant role in materially improving public safety, reducing crime, or strengthening communities.

*        *        *

We know that over-incarceration crushes opportunity. We know it prevents people, and entire communities, from getting on the right track. And we've seen that—as more and more government leaders have gradually come to recognize—at a fundamental level, it challenges our commitment to the cause of justice.

Eric Holder, Att'y Gen., One Year After Launching Key Sentencing Reforms, Attorney General Holder Announces First Drop in Federal Prison Population in More Than Three Decades (Sept. 23, 2014), *available at* http://www.justice.gov/opa/pr/one-year-after-launching-key-setencing-reforms-attorney-general-holder-annouces-first-drop-0. The Federal Bureau of Prisons (BOP) recently announced that the number of inmates also decreased in fiscal year 2015, marking the second consecutive year of decreases and reversing a 34 year trend of successive increases. Press Release, Bureau of Prisons, Federal Inmate Population Declines (October 5, 2015), *available at* https://www.bop.gov/resources/news/20151001_populationDecline.jsp. BOP stated that

an overall inmate reduction of over 11% is expected by the end of fiscal year 2016. *Id.*

Consistent with these observations, Congress, the President, and the Sentencing Commission have worked to expand the flexibility of the criminal justice system in various ways. Much effort has focused on reducing sentencing disparities and lowering the offense levels applicable to certain drug crimes. *See, e.g.*, Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010); U.S. Sentencing Guidelines Manual app. C, amend. 782 (U.S. Sentencing Comm'n 2014). The 2014 amendments to the Guidelines, which lowered the base offense levels applicable to drug offenses, will soon result in the early release of 6,000 prisoners, and ultimately are expected to result in the early release of up to 46,000 prisoners nationwide. Sari Horwitz, *Justice Department Set to Free 6,000 Prisoners, Largest One-time Release,* Wash. Post (October 6, 2015), https://www.washingtonpost.com/world/national-security/justice-department-about-to-free6000-prisoners-largest-one-time-release/2015/10/06/961f4c9a-6ba2-11e5-aa5b-f78a98956699_story.html. Moreover, the Sentencing Commission recently identified "encourage[ing] the use of alternatives to incarceration" as a new policy priority for 2015-16. 80 FR 48957 (Aug. 14, 2015).

In another example, the Department of Justice has altered its charging policies in a manner that grants prosecutors more

discretion to take into account the unique facts of particular

defendants and cases. *See* Memorandum from Eric Holder, Att'y

Gen., to United States Attorneys and the Assistant Att'y Gen.

for the Criminal Division, (Aug. 12, 2013), *available at*

http://www.justice.gov/sites/default/files/oip/legacy

/2014/07/23/ag-memo-department-policypon-charging-mandatory-

minimum-sentences-recidivist-enhancements-in-certain-

drugcases.pdf. Moreover, in his recent speech to the NAACP, the

President proposed a number of additional reforms:

> We should pass a sentencing reform bill through Congress
> this year. . . . We need to ask prosecutors to use their
> discretion to seek the best punishment, the one that's
> going to be most effective, instead of just the longest
> punishment. We should invest in alternatives to prison,
> like drug courts and treatment and probation programs.
> . .which ultimately can save taxpayers thousands of
> dollars per defendant each year.

President Barack Obama, Remarks by the President at the NAACP

Conference (July 14, 2015), *available at* https://www.whitehouse.

gov/the-press-office/2015/07/14/remarks-president-naacp-

conference. Proposals are currently pending in Congress that

would reduce mandatory-minimum sentences in certain cases and

otherwise provide more opportunity for the sentences of drug

offenders to be more closely tailored to the particular offense.

*See, e.g.*, SAFE Justice Act, H.R. 2944, 114th Cong. (2015);

Justice Safety Valve Act of 2015, S. 353, H.R. 706, 114th Cong.

(2015); Smarter Sentencing Act, S. 502, H.R. 920, 114th Cong.

(2015); Sentencing Reform and Corrections Act of 2015, S. 2123, 114th Cong. (2015).

These reform efforts are laudable because they would provide prosecutors and judges with greater flexibility and more tools to address the facts of individual cases and defendants, seeking to serve the twin goals of punishment and deterrence while also serving society's compelling interest in the rehabilitation of individuals. Regrettably, despite the renewed focus on such reforms, the deferred-prosecution agreement and other similar tools have not been used as much as they could to achieve reform. This oversight is lamentable, to say the least! The United States Attorneys' Manual contemplates the use of pretrial diversion for certain individuals, and the Criminal Resource Manual sets forth the procedures governing pretrial diversion agreements for such individuals. *See* U.S. Attorneys' Manual, 9-22.000, Pretrial Diversion Program, *available at* http://www.justice.gov/usam/usam-9-22000-pretrial-diversion-program#9-22.100 (Updated April 2011). To provide individuals with the opportunity for meaningful rehabilitation, it is critical that they be provided with adequate supervision. The Criminal Resource Manual contemplates the need for such supervision: "If it is determined that [Pretrial Diversion] is appropriate for an offender, supervision should be tailored to the offender's needs and may include employment, counseling,

education, job training, psychiatric care, etc. Many districts have successfully required restitution or forms of community service as part of the pretrial program. Innovative approaches are strongly encouraged." *See* U.S. Attorneys' Manual, Criminal Resource Manual, 712, Pretrial Diversion, *available at* http://www.justice.gov/usam/criminal-resource-manual-712-pretrial-diversion.

Another seldom used tool is pre-judgment probation, which is authorized by the Federal First Offender Act, 18 USC § 3607. Section 3607(a) gives courts the authority to place on probation persons found guilty of simple possession of a controlled substance if the person: (1) has not been convicted of violating a federal or state law relating to controlled substances; and (2) has not had a previous disposition under 18 USC § 3607. If the person complies with the conditions of probation, the court is authorized to dismiss the proceedings without entering a judgment of conviction. 18 USC § 3607(a). Furthermore, if the person was less than 21 years of age at the time of the offense, the court is authorized to enter an expungement order. 18 USC § 3607(c).

The Court recognizes that prosecutors are confronted regularly with difficult questions of how to exercise their discretion. The decision how to proceed in each case is within the expertise and constitutional responsibility of the Executive Branch, and

this Court has neither the desire nor the authority to dictate

charging decisions. The Court is, however, extremely dismayed

that despite all of the focus on providing tools for prosecutors

to reduce over-incarceration, attack the root causes of crime,

and mitigate where possible the collateral consequences of

criminal convictions, deferred-prosecution agreements for

individuals and other similar tools have gone largely

unmentioned. As President Obama recently recognized in commuting

the sentences of forty-six individuals convicted of non-violent

drug offenses, "America is a nation of second chances." Sari

Horwitz & Juliet Eilperin, *Obama Commutes Sentences of 46*

*Nonviolent Drug Offenders*, Wash. Post, July 13, 2015,

https://www.washingtonpost.com/world/national-security/obama-

commutes-sentences-of-46-non-violent-drug-

offenders/2015/07/13/b533f61e-2974-11e5-a250-42bd812efc09

_story.html. Deferred-prosecution agreements could provide a

powerful opportunity for a second chance for deserving

individuals.[17] Individual defendants should be given a chance to

rehabilitate, subject to the supervision of a court and

---

[17] In the Court's opinion, some will argue that deferred-
prosecution agreements would not serve a unique purpose because
drug courts can serve the same purpose. Such a position fails to
take into account the fact that federal drug courts are
dependent upon Congressional funding, and that drug offenses are
not the only offenses for which deferred-prosecution agreements
may be appropriate.

prosecutor, with an eye toward avoiding the very serious
collateral consequences that a criminal conviction can have for
an individual and for society. *Cf. Doe v. United States*, No. 14-
mc-1412, 2015 WL 2452613, at *4 (E.D.N.Y. May 21, 2015)
(expunging a prior conviction, Judge Gleeson chronicles the
"wide-ranging effects" of a criminal conviction, many of which
result in punishment that lasts long after a sentence has been
served without any corresponding benefit to the public: "simply
put, the public safety is better served when people with
criminal convictions are able to participate as productive
members of society by working and paying taxes."); *Stephenson v.
United States*, 2015 WL 5884810, at *3-*7 (E.D.N.Y. Oct. 7,
2015)(denying without prejudice Ms. Stephenson's application to
expunge a prior conviction based on controlling precedent and
the fact that she was employed and that her ability to become a
licensed nurse was realistic in light of applicable law
prohibiting discrimination on the basis of criminal history, but
noting the inconsistency between controlling precedent and the
accumulation of "solid evidence establishing that a criminal
conviction is often a significant obstacle to employment" as
well as the link between unemployment and recidivism, and
calling on all three branches of government to take action to
better ensure that persons who have "pa[id] [their] debt to
society" are truly given a second chance).

The Court is of the opinion that people are no less prone to rehabilitation than corporations. Drug conspiracy defendants are no less deserving of a second-chance than bribery conspiracy defendants. And society is harmed at least as much by the devastating effect that felony convictions have on the lives of its citizens as it is by the effect of criminal convictions on corporations. Extending the use of deferred-prosecution agreements to individuals who are charged with certain non-violent offenses would be a powerful tool to achieve one of the goals proposed by President Obama this year: "give judges some discretion around nonviolent crimes so that, potentially, we can steer a young person who has made a mistake in a better direction." President Barack Obama, Remarks by the President at the NAACP Conference (July 14, 2015), *available at* https://www.whitehouse.gov/the-press-office/2015/07/14/remarks-president-naacp-conference.

## VI. Conclusion.

Unless and until Congress amends the Speedy Trial Act to provide for broader involvement by the judiciary in assessing the substance of deferred-prosecution agreements, courts will be constrained to reviewing an agreement for: (1) whether it is truly intended to hold prosecution in abeyance while a defendant demonstrates rehabilitation, as required by the Speedy Trial Act; and (2) whether the agreement involves the Court in the

type of illegal or untoward activity that might impugn the Court's integrity. That authority, however, is not as limited as the government might prefer. Because the agreements in these cases transgress neither boundary, the Court approves them, and does not have occasion to set forth the full scope of a district court's authority to review and reject a deferred-prosecution agreement. Nothing in this Opinion should be interpreted to approve the judicial abdication of this review authority. Even agreements that clearly meet the requirements of the Speedy Trial Act and do not at all implicate a court's supervisory authority warrant searching review to establish why they should receive court approval.

The Court respectfully requests the Department of Justice to consider expanding the use of deferred-prosecution agreements and other similar tools to use in appropriate circumstances when an individual who might not be a banker or business owner nonetheless shows all of the hallmarks of significant rehabilitation potential. The harm to society of refusing such individuals the chance to demonstrate their true character and avoid the catastrophic consequences of felony convictions is, in this Court's view, greater than the harm the government seeks to avoid by providing corporations a path to avoid criminal convictions. If the Department of Justice is sincere in its expressed desire to reduce over-incarceration and bolster

rehabilitation, it will increase the use of deferred-prosecution agreements for individuals as well as increase the use of other available resources as discussed in this Opinion.

For the foregoing reasons, the Court **GRANTS** the requests for approval of the deferred-prosecution agreements and an exclusion of time under the Speedy Trial Act in each of these cases. Further, given that these cases remain pending on this Court's docket, the parties are directed to file periodic reports to update the Court on the status of the implementation of the agreements in each case as set forth in the Orders accompanying this Memorandum Opinion.

**Signed:**    **Emmet G. Sullivan**
              **United States District Judge**
              **October 21, 2015**